1  ROB BONTA (SBN 202668)
   Attorney General of California
2  LAURA L. FAER (SBN 233846)
   Acting Senior Assistant Attorney General
3  JOEL MARRERO (SBN 275601)
   Supervising Deputy Attorney General
4  JONATHAN BENNER (SBN 318956)
   EZRA KAUTZ (SBN 330352)
5  ANTHONY PINGGERA (SBN 320206)
   EDWARD NUGENT (SBN 330479)
6  Deputy Attorneys General
    455 Golden Gate Avenue, Suite 11000
7   San Francisco, CA  94102-7004
    Telephone:  (415) 229-0113
8   Fax:  (510) 622-2270
    E-mail:  Edward.Nugent@doj.ca.gov
9  *Attorneys for Plaintiff State of California*

10              IN THE UNITED STATES DISTRICT COURT

11          FOR THE NORTHERN DISTRICT OF CALIFORNIA

12                   SAN FRANCISCO DIVISION

13

14 | **STATE OF CALIFORNIA,** | Case No. 3:25-cv-04863-CRB |
15 | | |
   | Plaintiff, | |
16 | | |
   | v. | **COMPLAINT FOR DECLARATORY** |
17 | | **AND INJUNCTIVE RELIEF** |
18 | **U.S. DEPARTMENT OF JUSTICE;** | Administrative Procedure Act Case |
   | **PAMELA BONDI, IN HER OFFICIAL** | |
19 | **CAPACITY AS U.S. ATTORNEY GENERAL;** | Date: |
   | **HARMEET DHILLON, IN HER OFFICIAL** | Time: |
20 | **CAPACITY AS ASSISTANT ATTORNEY** | Dept:        Courtroom 6 |
   | **GENERAL FOR CIVIL RIGHTS, U.S.** | Judge:      Hon. Charles R. Breyer |
21 | **DEPARTMENT OF JUSTICE; AND UNITED** | Trial Date: |
   | **STATES OF AMERICA;** | Action Filed: June 9, 2025 |
22 | | |
   | Defendants. | |
23

24

25

26

27

28

**INTRODUCTION**

1. For more than a decade, it has been the law and policy of the State of California that all persons, regardless of their gender, gender identity, or gender expression, should enjoy equal rights and opportunities, and freedom from discrimination of any kind, in the educational institutions of the state, including in K-12 school athletics. *See* Cal. Educ. Code §§ 200, 220, 221.5(f).

2. In 2013, the California Interscholastic Federation (CIF), the statewide governing body for secondary school athletics, adopted CIF Bylaw 300.D. Bylaw 300.D states that "[a]ll students should have the opportunity to participate in CIF activities in a manner that is consistent with their gender identity, irrespective of the gender listed on a student's records."

3. In California, public education is uniquely a fundamental concern of the State, which has specific responsibility for its statewide public education system and its district-based system of common schools.

4. Each year, approximately one million of the State's eight million K-12 students participate in some form of athletic program through their schools, including both cisgender and transgender students.

5. Participation in school athletics can have lifelong benefits for students' physical and mental health, self-esteem, social connections, and academic success.

6. Inclusive school athletics programs have been shown to help all students, including transgender students, achieve physical and mental wellness; develop a strong work ethic, values, and sense of belonging; and improve access to academic resources and financial assistance. Such programs thus ensure that students have the equal opportunity to experience the social and health benefits of athletics, and to build social and emotional skills through teamwork.

7. In California, a small number of transgender students participate in school-sponsored athletics, from elementary school to middle school and beyond. For many young people, including transgender girls, the ability to experience the benefits of school athletics depends on their ability to play on a team that reflects their gender identity. Conversely, when students are excluded from school sports, they lose the opportunity to enjoy these significant benefits. And

1

1    allowing transgender students to participate in school sports only in accordance with their sex

2    assigned at birth is tantamount to exclusion. *B.P.J. v. W.V. State Bd. of Educ.*, 98 F.4th 542, 564

3    (4th Cir. 2024) (observing that forcing transgender girls to choose "between not participating in

4    sports and participating only on boys teams is no real choice at all"), *petition for cert. filed*,

5    No. 24-43.

6        8. All students—not just transgender students—benefit from inclusive school

7    environments that are free from discrimination and harassment. And when transgender students

8    are protected from gender-identity discrimination in all its forms, their mental health outcomes

9    mirror those of their cisgender peers. This renders educational environments more conducive to

10   learning and development, benefits that accrue to all students.

11       9. Defendants unlawfully seek to upend California's equal opportunity law by decree. On

12   information and belief, on June 2, 2025, Defendants sent every local educational agency (LEA) in

13   California a letter (the "Certification Demand Letter," attached hereto as Exhibit A) from the U.S.

14   Department of Justice (U.S. DOJ), and signed by Defendant Assistant Attorney General for Civil

15   Rights Harmeet Dhillon, asserting that Bylaw 300.D "requires California public high schools to

16   allow male participation in girls' interscholastic athletics," and that, as a result, Bylaw 300.D on

17   its face necessarily violates the Equal Protection Clause of the Fourteenth Amendment. The letter

18   demanded that every LEA in the State "certify" that it would not implement Bylaw 300.D by

19   June 9, 2025, "[t]o ensure compliance and to avoid legal liability."

20       10. Defendants have no right to make such a demand. They cite no authority which would

21   allow them to issue or enforce the Certification Demand Letter against California's LEAs, nor do

22   they provide any support for their claim that Bylaw 300.D violates the Equal Protection Clause of

23   the Fourteenth Amendment.

24       11. Neither California law nor Bylaw 300.D conflicts with the Equal Protection Clause of

25   the Fourteenth Amendment.

26       12. First, Bylaw 300.D and section 221.5(f) of the California Education Code (which,

27   much like Bylaw 300.D, permits all students to participate in school sports "consistent with" their

28   gender identity) do not violate the Equal Protection Clause. Bylaw 300.D and section 221.5(f) do

1  not classify or discriminate based on "biological sex," do not require schools to "depriv[e]

2  [cisgender] female students of athletic opportunities and benefits on the basis of their sex," and do

3  not effectuate any differential treatment on the basis of sex. Instead, allowing athletic

4  participation consistent with students' gender identity is substantially related to the important

5  government interests of affording all students the benefits of an inclusive school environment,

6  including participation in school sports, and preventing the serious harms that transgender

7  students would suffer from a discriminatory, exclusionary policy.

8      13. Second, prevailing law holds that U.S. DOJ's demand—namely, for schools to

9  categorically ban transgender students from participating in athletic programs in accordance with

10  their gender identity—violates the Equal Protection Clause. *See Doe v. Horne*, 115 F.4th 1083,

11  1109-10 (9th Cir. 2024), *petition for cert. filed*, No. 24-449; *Hecox v. Little*, 104 F.4th 1061, 1088

12  (9th Cir. 2024), *petition for cert. filed*, No. 24-38.

13      14. Furthermore, acceding to Defendants' demand would force California LEAs to violate

14  the Equal Protection Clause of the Fourteenth Amendment and California's antidiscrimination

15  laws. As set forth in the Certification Demand Letter, Defendants believe that compliance with

16  the Equal Protection Clause requires the categorical exclusion of transgender girls from girls'

17  sports—but the Equal Protection Clause in fact *forbids* such policies of total exclusion, as does

18  California law.

19      15. Through the Certification Demand Letter, Defendants attempt to create a conflict

20  between California law and the Equal Protection Clause by advancing their own unsupported

21  interpretation of the Equal Protection Clause—an interpretation that singles out transgender

22  students for discriminatory, adverse treatment and also conflicts with controlling case law.

23      16. Defendants' interpretation is also animated by discriminatory animus against

24  transgender people, including transgender students and athletes. *See, e.g.*, Exec. Order

25  No. 14,168, 90 Fed. Reg. 8615, 8615 (Jan. 30, 2025) (characterizing transgender identity as

26  "false"). *See generally infra* ¶¶ 63-81 (quoting, inter alia, Defendant Bondi's description of

27  "transgenderism" as an "infect[ion]," and Defendant Dhillon's assertion that transgender women

28  are "men pretending to be women").

3

17. By threatening California's LEAs with baseless legal action if they refuse to agree to Defendants' unlawful demands, Defendants create an imminent risk of irreparable harm to California's proprietary, sovereign, and quasi-sovereign interests.

18. For these reasons, and those discussed below, Plaintiff State of California respectfully requests that the Court grant declaratory and injunctive relief from the Certification Demand Letter and award other such relief as is requested herein.

## JURISDICTION AND VENUE

19. **Jurisdiction:** This Court has subject matter jurisdiction under 28 U.S.C. § 1331 because this case arises under the U.S. Constitution and the Administrative Procedure Act.

20. An actual, present, and justiciable controversy exists between the parties within the meaning of 28 U.S.C. § 2201(a). This Court has authority to grant declaratory relief and other relief under the Declaratory Judgment Act, 28 U.S.C. §§ 2201-2202.

21. Venue is proper in this district under 28 U.S.C. § 1391(e)(1). Defendants are U.S. agencies or officers sued in their official capacities. Plaintiff State of California is a resident of this judicial district, and no real property is involved in this action.

22. **Divisional Assignment:** Assignment to the San Francisco Division of this District is proper pursuant to Civil Local Rule 3-2(c)-(d) because this case is district-wide (indeed, statewide) in nature, and Plaintiff State of California maintains offices in the City and County of San Francisco.

## PARTIES

**I.    PLAINTIFF**

23. California is a sovereign State of the United States of America. Rob Bonta is the Attorney General of California, and as the State's chief law officer, he is authorized to sue on the State's behalf, including the California Department of Education, California LEAs, the State's public schools, and their students. *See* Cal. Const. art. V, § 13; *id.* art. IX, § 5 (requiring the State to "provide for a system of common schools").

24. In filing this action, California seeks to protect itself, and California K-12 schools and students, by preventing harms threatened by Defendants' illegal attempt to force California LEAs

4

to adopt the federal government's unsupported position that transgender students' participation in athletics consistent with their gender identity categorically violates the Equal Protection Clause of the Fourteenth Amendment. Those harms include injury to California's proprietary, sovereign, and quasi-sovereign interests.

## II. DEFENDANTS

25. Defendant U.S. Department of Justice is a cabinet agency within the executive branch of the U.S. government. 28 U.S.C. § 501.

26. Defendant Pam Bondi is the Attorney General of the United States. She is the head of U.S. DOJ and is responsible for all the decisions and actions of that agency. 28 U.S.C. § 503. She is sued in her official capacity.

27. Defendant Harmeet Dhillon is the Assistant Attorney General for the Civil Rights Division of U.S. DOJ and is responsible for enforcing federal civil rights statutes. 28 C.F.R. § 0.50 (promulgated Dec. 31, 1969). She is the signatory of the Certification Demand Letter and is sued in her official capacity.

28. Defendant United States of America includes all executive agencies and departments, including U.S. DOJ.

## FACTUAL ALLEGATIONS

## I. BACKGROUND

### A. Medical Evidence Related to Gender Identity

29. Each individual's sex is comprised of several different biological characteristics, including chromosomal makeup, hormones, internal and external reproductive organs, secondary sex characteristics, and gender identity.

30. "Gender identity" is the medical term for a person's internal, innate sense of belonging to a particular sex (i.e., "male, female, neither, or some combination of both"). Every person has a gender identity. There is a medical consensus that gender identity has a significant biological component that is encoded in the womb and fixed at birth.[1]

---

[1] Joshua D. Safer & Vin Tangpricha, *Care of Transgender Persons*, 381 New Eng. J. Med. 2451, 2451 (2019).

31. Gender identity is a fundamental aspect of human identity and development for all people.

32. A person's gender identity cannot be changed by medical, psychological, or social intervention,[2] and efforts to do so are considered unethical and are clinically disapproved.[3]

33. Being able to live consistent with one's gender identity is critical to one's health and well-being.

34. Directly after a child is born, the usual practice in this country is for a physician to visually assess the newborn's external reproductive organs and assign the newborn's sex as "male" or "female" on that basis, which is recorded as the official designation on the infant's birth certificate.

35. A person's gender identity often matches their sex assigned at birth, but not always. Most people are cisgender, meaning that their sex assigned at birth aligns with their gender identity. For transgender individuals, however, their sex assigned at birth does not align with their gender identity.

36. Transgender individuals represent a small minority of the population in the United States. Only about 1.6 million adults and youth identify as transgender in the United States, or around 0.6% of those ages 13 and older.[4]

---

[2] *See generally* Jack L. Turban et al., *Association Between Recalled Exposure to Gender Identity Conversion Efforts and Psychological Distress and Suicide Attempts Among Transgender Adults*, 77 JAMA Psych. 68 (2020) (finding that conversion therapy was ineffective and led to higher psychological distress and increased risk of suicide attempts).

[3] *E.g.*, Jack Turban, *What Is Gender Dysphoria?*, Am. Psychiatric Ass'n (Aug. 2022), https://www.psychiatry.org/patients-families/gender-dysphoria/what-is-gender-dysphoria ("Psychological attempts to force a transgender person to be cisgender . . . are considered unethical and have been linked to adverse mental health outcomes."); *APA Resolution on Gender Identity Change Efforts*, Am. Psych. Ass'n 1-4 (Feb. 2021), https://www.apa.org/about/policy/resolution-gender-identity-change-efforts.pdf; *Issue Brief: Sexual Orientation and Gender Identity Change Efforts (So-Called "Conversion Therapy")*, Am. Med. Ass'n (2022), https://www.ama-assn.org/system/files/conversion-therapy-issue-brief.pdf; *Policy Statement: Conversion Therapy*, Am. Acad. of Child & Adolescent Psychiatry (Feb. 2018), https://www.aacap.org/AACAP/Policy_Statements/2018/Conversion_Therapy.aspx.

[4] Jody L. Herman, Andrew R. Flores & Kathryn K. O'Neill, *How Many Adults and Youth Identify as Transgender in the United States?*, Williams Inst., UCLA School of Law 1 (2022), https://williamsinstitute.law.ucla.edu/wp-content/uploads/Trans-Pop-Update-Jun-2022.pdf.

6

37. According to the American Psychological Association, transgender individuals "ha[ve] been documented in a range of historical cultures."[5] *See also Hecox*, 104 F.4th at 1076 n.9 ("[T]here is evidence that transgender people have existed since ancient times.").

38. Transgender identity is not unhealthy or defective, and as mentioned above, efforts to change or "cure" transgender identity are unnecessary, ineffective, and unethical. For example, under the American Psychiatric Association's DSM-5, transgender identity on its own does not support a diagnosis of any mental illness, and the American Psychiatric Association and the World Health Organization do not classify transgender identity as a mental illness.

39. However, forcing a transgender person to live in a manner that does not align with that person's gender identity, such as requiring a transgender girl to participate in single-sex activities designated for boys, can be extremely harmful to their well-being.

40. In this regard, transgender students are also at far higher risk of suicide and serious mental health issues because they face discrimination, including exclusion and harassment, on the basis of their gender identity.

41. In one recent study, 56% of transgender individuals aged 14 to 18 reported a previous suicide attempt, and 86% reported having suicidal thoughts.[6]

42. Inclusive policies that allow students to participate in activities consistent with their gender identity are particularly important for transgender youth.

43. LGBTQ students who experience discrimination at school are more likely to skip school, have lower GPAs, and to consider dropping out of school altogether.[7]

44. When schools do not affirm or accept transgender students' gender identity, their risks of suicide increase significantly.

---

[5] Am. Psych. Ass'n, *Guidelines for Psychological Practice with Transgender and Gender Nonconforming People*, 70(9) Am. Psych. 832, 832 (2015), https://www.apa.org/practice/guidelines/transgender.pdf.
[6] Ashley Austin et al., *Suicidality Among Transgender Youth: Elucidating the Role of Interpersonal Risk Factors*, 37 J. of Interpersonal Violence NP2696-NP2718 (Apr. 29, 2020), https://journals.sagepub.com/doi/10.1177/0886260520915554.
[7] Joseph G. Kosciw, Caitlin M. Clark & Leesh Menard, GLSEN, *The 2021 National School Climate Survey: The Experiences of LGBTQ+ Youth in Our Nation's Schools* 19-20 (2022), https://www.glsen.org/sites/default/files/2022-10/NSCS-2021-Full-Report.pdf [hereinafter Kosciw 2021].

45. One survey found that transgender youth who did not have their gender identity affirmed attempted suicide at twice the rate of transgender youth who had their gender identity respected.[8]

46. Another study showed that states that passed anti-transgender laws aimed at minors, such as laws excluding transgender youth from school activities consistent with their gender identity, saw suicide attempts by transgender and gender nonconforming teenagers increase by as much as 72% in the following years.[9]

47. By contrast, transgender youth who are permitted to live consistently with their gender identity have mental health outcomes comparable to their cisgender peers.[10]

**B.    Participation of Transgender Youth in School-Sponsored Athletics**

48. For children and youth, participation in school-sponsored athletics can have lifelong benefits, including improved physical health outcomes later in life.

49. Children and young adults on school sports teams experience lower rates of depression, anxiety, and suicidality.

50. Athletics allow students to gain confidence, develop important social and emotional skills, build social connections, and experience the camaraderie of being on a team. When young people are denied access to school-sponsored sports, and feel ostracized and excluded, they lose the opportunity to experience those benefits.

51. Studies have also linked participation in organized sports to stronger academic and cognitive performance in children and adolescents.[11]

---

[8] *See* Trevor Project, *National Survey on LGBTQ Youth Mental Health 2020*, at 9 (2020), https://www.thetrevorproject.org/wp-content/uploads/2020/07/The-Trevor-Project-National-Survey-Results-2020.pdf (finding highly elevated risk of suicide due to failure to affirm gender identity through use of pronouns consistent with gender identity).

[9] Wilson Y. Lee et al., *State-Level Anti-Transgender Laws Increase Past-Year Suicide Attempts Among Transgender and Non-Binary Young People in the USA*, 8 Nature Human Behavior 2096, 2096 (Sept. 26, 2024), https://www.nature.com/articles/s41562-024-01979-5.

[10] Kristina R. Olson et al., *Mental Health of Transgender Children Who Are Supported in Their Identities*, 137 Pediatrics e20153223, at 5-7 (Mar. 2016), https://pmc.ncbi.nlm.nih.gov/articles/PMC4771131/pdf/PEDS_20153223.pdf.

[11] Tania Pinto-Escalona et al., *Sport Participation and Academic Performance in Young Elite Athletes*, 19 Int'l J. of Env't Rsch. & Pub. Health 1 (2022), https://pmc.ncbi.nlm.nih.gov/articles/PMC9737165/pdf/ijerph-19-15651.pdf.

52. Transgender athletes also report higher grades than those who do not participate in sports, and LGBTQ athletes reported higher levels of self-esteem and a 20 percent lower rate of depressive symptoms.[12]

53. In California, children and youth have a wide range of opportunities to participate in school-sponsored athletics. Those opportunities are available at all levels of schooling, and in all types of sports. They are also available at all levels of skill, from recreational sports to high-level competition.

54. Just as cisgender girls can only experience these benefits of sex-separated school athletics by participating on the same team as other girls, transgender girls can only experience the benefits associated with sex-separated school athletics by participating on teams with other girls.

**C.    Education Code Section 221.5(f) and CIF Bylaw 300.D**

55. California has enacted laws and policies aimed at ensuring that students have equal access to school-sponsored teams without regard to sex-based characteristics or gender. These laws recognize that allowing youth to participate in school-sponsored activities consistent with their gender identity is critical for their health and well-being.

56. In 2013, the California State Legislature passed, and then-Governor Jerry Brown signed, Assembly Bill No. 1266, codified as section 221.5(f) of the California Education Code, which requires that "[a] pupil shall be permitted to participate in sex-segregated school programs and activities, including athletic teams and competitions . . . irrespective of the gender listed on the pupil's records."

57. In addition to the specific protections of section 221.5(f), California law has broadly prohibited gender-identity discrimination in education since 2012. *See* Cal. Educ. Code §§ 200, 220.

---

[12] Trevor Project, *The Trevor Project Research Brief: The Well-Being of LGBTQ Youth Athletes* (Aug. 2020), https://www.thetrevorproject.org/wp-content/uploads/2020/08/LGBTQ-Youth-Sports-and-Well-Being-Research-Brief.pdf; Caitlin M. Clark, Joseph G. Kosciw & Jacquelyn Chin, GLSEN, *LGBTQ Students and School Sports Participation: Research Brief* 8 (2021), https://www.glsen.org/sites/default/files/2022-02/LGBTQ-Students-and-School-Sports-Participation-Research-Brief.pdf.

9

58. Since that time, cisgender and transgender athletes, from kindergarten through high school, have played on teams together and competed against one another at all levels of athletics across the State. And for a much longer time, many California schools at all levels have had a variety of co-ed sports teams, events, and competitions.

59. In 2013, CIF updated its bylaws to require that "[a]ll students should have the opportunity to participate in CIF activities in a manner that is consistent with their gender identity, irrespective of the gender listed on a student's records."[13]

60. Laws and policies like section 221.5(f) and Bylaw 300.D, which promote school programs and activities that are inclusive and free from discrimination and harassment, are essential to the well-being of all students, regardless of their gender or gender identity. As discussed above, inclusive school athletics programs have been shown to help all students, including transgender students, achieve physical and mental wellness; develop a strong work ethic, values, and sense of belonging; and improve access to academic resources and financial assistance.[14]

61. There is no evidence that a categorical bar on the prohibition of all transgender girls in girls' sports promotes fair athletic competition or opportunity. To the contrary, denying transgender youth an opportunity to participate in school-sponsored athletics subjects those youth to unlawful discrimination by denying them equal access to educational benefits.

62. Moreover, there is no conflict between CIF Bylaw 300.D—which reflects the guarantee, under section 221.5(f), that all students may participate in school athletics in

---

[13] California Interscholastic Federation, Constitution and Bylaws, Bylaw 300.D (2024-2025), https://www.cifstate.org/governance/constitution/300_Series.pdf.

[14] *See, e.g.*, Olson et al., *supra* note 10, at 5-7; Joseph G. Kosciw et al., GLSEN, *The 2015 National School Climate Survey: The Experiences of Lesbian, Gay, Bisexual, Transgender, and Queer Youth in Our Nation's Schools* xviii-xxi, 41-45, 48-49 (2016), https://www.glsen.org/research/2015-national-school-climate-survey (follow link to PDF of "Full Report"); *see also* E. Coleman et al., World Pro. Ass'n for Transgender Health, *Standards of Care for the Health of Transgender and Gender Diverse People, Version 8*, 23 Int'l J. of Transgender Health S1, S107 (2022), https://www.tandfonline.com/doi/pdf/10.1080/26895269.2022.2100644; Linda Darling-Hammond et al., *Implications for Educational Practice of the Science of Learning and Development*, 24 Applied Dev. Sci. 97, 102 (2019), https://www.tandfonline.com/doi/full/10.1080/10888691.2018.1537791.

accordance with their gender identity—and the Equal Protection Clause of the Fourteenth Amendment; rather, they are consistent with each other.

### D.    The Trump Administration's Animus-Laden Attacks on Transgender Americans, Including Transgender Students

63. Throughout his presidential campaign for the 2024 election, and since taking office, President Donald Trump and his administration have consistently expressed contempt and animosity for transgender people as a group.

64. During the 2024 presidential campaign, the Trump campaign reportedly dedicated nearly a third of its television advertising spending to anti-trans and anti-LGBTQ television advertisements.[15]

65. President Trump has promised to "defeat the cult of gender ideology" and warned against "the transgender cult"—even falsely suggesting that "gender ideology" is responsible for inflation and that "transgender hormone treatments and ideology" lead to violence.[16]

66. President Trump has promised to drive out "transgender insanity" from schools.[17]

67. On multiple occasions, President Trump has singled out transgender student-athletes for particular scorn, including by stating: "These people are sick. They're deranged."[18]

---

[15] Kiara Alfonseca & Soo Rin Kim, *Trump and Allies Are Pouring Millions into Anti-Trans Election Ads as Election Nears*, ABC News (Oct. 21, 2024), https://abcnews.go.com/US/trump-spends-millions-anti-trans-ads-despite-polls/story?id=115001816.

[16] Erin Burnett, *Trump's Remarks on Transgender People Reveal Flip-Flop*, CNN (June 17, 2023), https://edition.cnn.com/videos/politics/2023/06/17/trump-remarks-transgender-women-inclusion-beauty-pageant-kfile-ebof-vpx.cnn; Kevin Breuninger, *Trump Accuses Fed, Powell of Creating Inflation on Heels of Rate Decision*, CNBC (Jan. 29, 2025), https://www.cnbc.com/2025/01/29/trump-accuses-fed-powell-of-creating-inflation-on-heels-of-rate-decision.html; Ryan Bort & Charisma Madarang, *Trump Says He'll Launch Probe into Whether Trans "Ideology" Leads to Mass Shootings*, Rolling Stone (Apr. 14, 2023), https://www.rollingstone.com/politics/politics-news/trump-nra-transgender-health-care-1234715275/.

[17] Laura Meckler & Hannah Natanson, *Trump Vowed to Push Schools to the Right on Gender and Race. Now He Can.*, Wash. Post (Nov. 17, 2024), https://www.washingtonpost.com/education/2024/11/17/trump-education-schools-transgender-race-culture/.

[18] Sally Jenkins, *Ban on Trans Athletes Seeks to Demonize, Not Protect*, Wash. Post (Feb. 5, 2025), https://www.washingtonpost.com/sports/2025/02/05/trans-athlete-ban-trump-executive-order/.

11

68. Immediately upon taking office, President Trump also began issuing a series of executive orders intended to exclude and vilify transgender individuals.

69. On January 20, 2025, President Trump issued an executive order stating that there is an "immutable biological reality of sex . . . that women are biologically female, and men are biologically male." Exec. Order No. 14,168, 90 Fed. Reg. at 8615. The order further contends that "[t]hese sexes are not changeable and are grounded in fundamental and incontrovertible reality." *Id.* The order announces that "the policy of the United States [is] to recognize two sexes, male and female," and that "the Executive Branch will enforce all sex-protective laws to promote this reality." *Id.* Furthermore, despite the empirical existence of transgender (and intersex) individuals, the order declares that transgender identity is "false." *Id.*

70. On January 27, 2025, in an executive order barring transgender individuals from serving in the military, President Trump stated that "expressing a false 'gender identity'" is incompatible with "an honorable, truthful, and disciplined lifestyle." Exec. Order No. 14,183, 90 Fed. Reg. 8757, 8757 (Feb. 3, 2025).

71. On February 5, 2025, President Trump issued an executive order seeking to specifically prohibit transgender girls (and women) from participating in girls' (and women's) sports. Exec. Order No. 14,201, 90 Fed. Reg. 9279, 9279 (Feb. 11, 2025) (hereinafter "Sports Ban EO"). The Sports Ban EO refers to transgender girls and women as "men" and asserts that it is "demeaning" to cisgender girls and women to participate alongside transgender girls and women. *Id.*

72. The Sports Ban EO directs that "[a]ll executive departments and agencies . . . shall review grants to educational programs and, where appropriate, rescind funding to programs that fail to comply with the policy established in this order." *Id.* at 9280. This section of the Sports Ban EO directs every federal agency to rescind funding to any educational program that permits transgender girls and women to participate on a sports team for girls and women, regardless of their age, their testosterone levels, the type of sport, or the level of athletic competition.

73. President Trump has continued to make statements connecting these executive orders to his animus against transgender individuals.

74. On May 27, 2025, in a post on Truth Social, President Trump singled out a 16-year-old transgender high school girl for criticism, calling her "a transitioned Male athlete." President Trump threatened that "large scale Federal Funding will be held back, maybe permanently, if the Executive Order on this subject matter is not adhered to."[19]

75. On June 2, 2025, in a subsequent Truth Social post, President Trump continued his targeted opposition to the transgender girl, calling her a "Biological Male." He also threatened "Governor Gavin Newscum" that "large scale fines will be imposed!!!"[20]

76. President Trump's executive orders and statements demonstrate an unapologetic animus towards transgender people that has permeated the entire administration, including but not limited to U.S. DOJ.

77. Defendant Attorney General Pam Bondi has repeatedly called transgender girls "boys."[21]

78. In an internal memorandum dated April 22, 2025, and since published on U.S. DOJ's website, Defendant Bondi described "transgenderism" as an "infect[ion]," and wrote that it is "[t]ragic and absurd . . . that 1.4% of 13- to 17-year-olds now identify as transgender."[22]

79. Defendant Dhillon has accused "trans activists" of "eras[ing] all the gains women have made toward equality and independence."[23]

80. Defendant Dhillon has criticized transgender-inclusive school environments as "predatory gender madness."[24]

---

[19] Donald J. Trump (@realDonaldTrump), Truth Social (May 27, 2025, 6:07 AM), https://truthsocial.com/@realDonaldTrump/posts/114579949187402607.
[20] Donald J. Trump (@realDonaldTrump), Truth Social (June 2, 2025, 9:56 PM), https://truthsocial.com/@realDonaldTrump/posts/114617654959425582.
[21] *E.g.*, Letter from Attorney General Pam Bondi to CIF Executive Director Ron Nocetti, U.S. Dep't of Just. (Feb. 25, 2025), https://www.justice.gov/ag/media/1390791/dl.
[22] Memorandum from Attorney General Pam Bondi to Select Component Heads, Preventing the Mutilation of American Children, U.S. Dep't of Just. (Apr. 22, 2025), https://www.justice.gov/ag/media/1402396/dl.
[23] Harmeet K. Dhillon (@HarmeetKDhillon), X (Mar. 29, 2023, 3:19 PM), https://x.com/HarmeetKDhillon/status/1641203541665787905.
[24] Harmeet K. Dhillon (@HarmeetKDhillon), X (May 8, 2024, 6:17 AM), https://x.com/HarmeetKDhillon/status/1788196613288300746.

81. Defendant Dhillon has referred to transgender women as "men pretending to be women."[25]

### E.    The Certification Demand Letter from U.S. DOJ

82. On June 2, 2025, Defendant U.S. DOJ issued the Certification Demand Letter, addressed to every LEA in California, which asserts that CIF Bylaw 300.D is "facially unconstitutional."

83. In the Certification Demand Letter, Defendant Dhillon, on behalf of U.S. DOJ, asserted that permitting transgender girls to compete in girls' sports "would deprive [cisgender] girls of athletic opportunities and benefits based solely on their biological sex, in violation of the Equal Protection Clause."

84. To purportedly "ensure compliance and avoid legal liability," Defendant Dhillon therefore demanded that all California LEAs "certify in writing by 5:00 p.m. ET on June 9, 2025, that you will not implement CIF Bylaw 300.D."

85. On June 3, 2025, CDE sent a letter addressed to California LEAs to explain that "[t]he DOJ assertions are not in themselves law" and to inform them that "CDE plans to respond to the DOJ on behalf of the state and its LEAs by the requested date."[26]

86. Today—June 9, 2025—CDE is sending a letter to U.S. DOJ on behalf of California's LEAs to inform U.S. DOJ that California and its LEAs have already provided the requisite certifications that they comply with the U.S. Constitution; that the Certification Demand Letter cites no authority to demand further certification; and that Bylaw 300.D, like California law, is consistent with the Equal Protection Clause and protects students' access to the significant benefits of school sports, regardless of their gender identity.

---

[25] Center for American Liberty (@Liberty_Ctr), X (Apr. 30, 2024, 1:06 PM), https://x.com/Liberty_Ctr/status/1785400332517798007.
[26] Cal. Dep't of Educ., *Update Regarding Compliance with Equal Protection Clause of U.S. Constitution* (June 3, 2025), https://www.cde.ca.gov/nr/el/le/yr25ltr0603.asp.

1        **1.**    **The Certification Demand Letter Would Require California to**

2            **Violate the Equal Protection Clause**

3        87. The Certification Demand Letter would require California and its LEAs to

4    discriminate against transgender girls in K-12 school sports by categorically excluding them from

5    girls' sports. This is a form of discrimination on the basis of sex, and would therefore violate both

6    the Equal Protection Clause of the Fourteenth Amendment and section 221.5(f) of the California

7    Education Code.

8        88. To characterize Defendants' demand as *upholding*, rather than *violating*, the Equal

9    Protection Clause—and to manufacture a conflict between California law and the Equal

10    Protection Clause, where none, in fact, exists—Defendants' legal position ignores binding Ninth

11    Circuit precedent.

12        89. Defendants are attempting to rewrite federal law, nullify California law, and force

13    California's LEAs to comply with their demands by threatening the LEAs with legal action.

14        **2.**    **U.S. DOJ's Unlawful Threat of "Legal Liability" Presents an**

15            **Imminent and Irreparable Injury to California and Infringes upon**

16            **the State's Substantial Interests**

17        90. The Certification Demand Letter imminently and irreparably threatens California's

18    sovereign interests by interfering with its primary authority to enact and enforce its own

19    antidiscrimination laws, including antidiscrimination laws specific to the educational context,

20    which are consistent with the Equal Protection Clause.

21        91. As mentioned previously, *supra* ¶ 1, California has enacted laws that protect students

22    from discrimination on the basis of gender identity or sex characteristics (including intersex

23    conditions). *See* Cal. Educ. Code §§ 200, 220.

24        92. The demand that LEAs discriminate against students on the basis of sex-based

25    characteristics and gender identity infringes upon California's sovereign interests by inhibiting its

26    ability to apply its own laws and policies prohibiting such discrimination.

27

28

93. The demands in the Certification Demand Letter are also fundamentally incompatible with the State's recognition of transgender (and intersex) individuals, as well as its laws and policies prohibiting discrimination and requiring equal opportunity in education.

94. Moreover, neither Bylaw 300.D nor section 221.5(f) conflicts with the Equal Protection Clause of the Fourteenth Amendment—which does not prohibit students from participating on sports teams that align with their gender identity, and does not require sports teams to be separated by sex assigned at birth.

95. To the contrary, under current law, U.S. DOJ's demands in the Certification Demand Letter to categorically ban transgender girls from participation in the school sports teams that correspond with their gender identity would require California LEAs to violate the Equal Protection Clause.

96. States have a quasi-sovereign interest in protecting the safety and well-being of their residents; this interest is particularly strong and compelling in matters relating to the physical safety of their residents and the protection of children.

97. Defendants' statements and actions, as well as those of President Trump, create a distorted narrative that dehumanizes transgender children and pits them against cisgender students. This narrative instigates antagonism and discrimination towards a discrete and insular class of children and demands that LEAs violate the equal protection rights of transgender students by categorically excluding them from school athletics programs that align with their gender identity.

98. California has established legal protections from sex-based discrimination, including discrimination based on gender identity and sex characteristics (such as intersex conditions), as reflected in Bylaw 300.D.

99. Through the Certification Demand Letter, Defendants seek to prevent California from protecting the right of transgender students—like all students—to participate in school athletics in accordance with their gender identity. This, in turn, (1) subjects transgender (and intersex) students to unlawful discrimination; (2) increases the risk that they will suffer severe physical, mental, emotional, or academic harm as a result of discrimination and exclusion; and (3) invites

16

discrimination, harassment, and hostility into educational programs and activities, which undermine the social and emotional well-being of all students (and especially the well-being of transgender students).

100. Protecting public health is one of the police powers reserved to the states. By effectively preventing its transgender students from being subjected to sex-based discrimination (and its subsequent harms to physical and mental health) in its education institutions, California can significantly improve the health and life outcomes of transgender individuals, who currently experience some of the highest rates of suicidality and mental health issues of any group, and thereby reduce the need for State-supported healthcare and assistance.[27]

101. Seventy-one percent of transgender youth have experienced sex-based discrimination at some point,[28] which leads to negative health outcomes for transgender students at a higher rate than any other student subgroup.[29]

102. This is not an abstract concern: Transgender students who experience discriminatory policies tend to have lower grades, lower levels of educational achievement and aspiration, lower self-esteem, and higher levels of depression and suicidality.[30] Tragically, discriminatory policies are linked to stark increases (as high as 72%) in suicide attempts by transgender youth.[31]

103. By contrast, transgender students who experience support and affirmation in any environment, including sports, experience mental health outcomes that mirror those of their cisgender peers.[32]

104. While inclusive school environments have significant benefits for transgender students, those benefits extend to the school community as a whole. All students who experience

---

[27] *E.g.*, Sandy E. James et al., Nat'l Ctr. for Transgender Equal., *The Report of the 2015 U.S. Transgender Survey* 132 (Dec. 2016), https://transequality.org/sites/default/files/docs/usts/USTS-Full-Report-Dec17.pdf; Joseph G. Kosciw et al., GLSEN, *The 2019 National School Climate Survey* 52-54 (2020), https://www.glsen.org/sites/default/files/2020-10/NSCS-2019-Full-Report_0.pdf; Austin et al., *supra* note 6.
[28] Trevor Project, *2022 National Survey on LGBTQ Youth Mental Health* 17 (2022), https://www.thetrevorproject.org/survey-2022/assets/static/trevor01_2022survey_final.pdf.
[29] Thomas Hanson et al., *Understanding the Experiences of LGBTQ Students in California* 9, 52 (Oct. 2019), https://files.eric.ed.gov/fulltext/ED601909.pdf.
[30] Kosciw 2021, *supra* note 7, at xviii-xx, 36-37.
[31] *See generally* Lee et al., *supra* note 9.
[32] Olson et al., *supra* note 10, at 5-7.

17

safe and supportive school environments see improved academic performance and psychological

development, and such schools become more effective at preventing violence and retaining

teachers.[33] In the context of sports, youths involved in supportive athletic environments

experience greater self-esteem and develop greater self-regulation, while experiencing less

depression and burnout than youths in less supportive and more arbitrarily exclusive

environments.[34]

105. By promoting equal access to education for all students regardless of gender,

California better prepares students to contribute to society, both culturally and economically.

106. By contrast, the Certification Demand Letter threatens to significantly increase harms

to California's transgender (and intersex) residents, diminish the benefits of inclusive school

environments to all students, and increase corresponding healthcare and other costs borne by

California.

### 3.    Defendants Lack the Authority to Demand the Certification at Issue

107. The Certification Demand Letter makes no reference to any statutory or regulatory

authority pursuant to which Defendants may demand certification.

108. o the extent Defendants use the Certification Demand Letter to place a condition on

California's federal funding, Congress has never authorized U.S. DOJ to demand a written

certification of this kind, which, among other things, requires LEAs' refusal to comply with a

policy unconnected to a resolution of a formal investigation with findings of noncompliance.

109. There is no authority for Defendants to demand an ad-hoc certification that a state or

state entity not comply with its own policy (or law), in the absence of a specific statutory grant of

authority to do so in specific circumstances.

---

[33] *See, e.g.*, Jenna Howard Terrell et al., *Conceptualizing and Measuring Safe and Supportive Schools*, 24 Contemp. Sch. Psych. 3 (Aug. 2020), https://www.researchgate.net/publication/343619376_Conceptualizing_and_Measuring_Safe_and_Supportive_Schools; Darling-Hammond et al., *supra* note 14, at 97-98.

[34] *See, e.g.*, Lori A. Gano-Overway et al., *Influence of Caring Youth Sport Contexts on Efficacy-Related Beliefs and Social Behaviors*, 45 Dev. Psych. 329-340 (2009), https://pubmed.ncbi.nlm.nih.gov/19271822/.

110. In particular, Defendants lack the statutory authority to demand that LEAs certify that they do not comply with a policy allowing students to participate in athletic programs in accordance with their gender identity.

111. Furthermore, Defendants necessarily lack the authority to demand that LEAs provide a certification that would entail violating the Equal Protection Clause.

112. In addition to the legal shortcomings of the Certification Demand Letter, to the extent that U.S. DOJ seeks to place a condition on federal funding, California could not have had clear notice of such a funding condition—not least because multiple circuit courts have held that a total ban on transgender girls participating in athletics consistent with their gender identity, as demanded by U.S. DOJ, violates the Equal Protection Clause. *See Horne*, 115 F.4th at 1109-10; *Hecox*, 104 F.4th at 1088; *see also B.P.J.*, 98 F.4th at 562. The lack of notice is especially obvious since California's law has remained unchanged for more than a decade, with no question (until now) that it is consistent with the Constitution.

## CAUSES OF ACTION

## COUNT I

**Declaratory Judgment That California Law Does Not Violate the Equal Protection Clause**

**(28 U.S.C. § 2201(a); Against All Defendants)**

113. Plaintiff State of California incorporates by reference the foregoing paragraphs of this Complaint as if set forth at length.

114. The Declaratory Judgment Act states, in relevant part: "In a case of actual controversy within its jurisdiction . . . any court of the United States, upon the filing of an appropriate pleading, may declare the rights and other legal relations of any interested party seeking such declaration, whether or not further relief is or could be sought." 28 U.S.C. § 2201(a).

115. An actual and substantial controversy exists between California and Defendants about whether CIF Bylaw 300.D facially violates the Equal Protection Clause.

116. This action is presently justiciable because Defendants have threatened to take enforcement action against California LEAs based on the assertion that CIF Bylaw 300.D "is

19

facially unconstitutional" because following it "would deprive [cisgender] girls of athletic opportunities and benefits based solely on their biological sex, in violation of the Equal Protection Clause."

117. Plaintiff asserts, by contrast, that CIF Bylaw 300.D, on its face, does not violate the Equal Protection Clause.

118. The Equal Protection Clause of the Fourteenth Amendment prohibits "any State" from "deny[ing] to any person within its jurisdiction the equal protection of the laws." U.S. Const. amend. XIV, § 1.

119. A policy facially violates the Equal Protection Clause when "no set of circumstances exists under which the [policy] would be valid." *United States v. Salerno*, 481 U.S. 739, 745 (1987).

120. Contrary to Defendants' assertion, for multiple independent reasons, a policy allowing K-12 students to participate in athletic programs consistent with their gender identity is not facially unconstitutional.

121. *First*, Bylaw 300.D does not classify or discriminate based on "biological sex," nor does Bylaw 300.D require schools to "depriv[e] [cisgender] female students of athletic opportunities and benefits on the basis of their sex," as Defendants assert.

122. Regardless of their sex assigned at birth, students in California are permitted to participate on teams consistent with their gender identity. This is not different treatment on the basis of "biological sex"—it is the same treatment for all students.

123. *Second*, to the extent that Defendants contend that Bylaw 300.D is subject to heightened scrutiny—even though it does not use a suspect classification or prescribe different treatment—Bylaw 300.D is substantially related to the achievement of important government interests.

124. A policy allowing students to participate in athletic programs free of discrimination is substantially related to California's important interests, including but not limited to:

      a.   fostering an inclusive environment at school and in the athletic program;

b. ensuring that students receive equal access to the academic, psychological, and social benefits of an inclusive environment; and

c. preventing the academic, psychological, and social harm that would be caused to all students, and especially transgender students, by an exclusionary policy.

125. *Third*, the Ninth Circuit has indicated that the Equal Protection Clause, as applied, prohibits schools from categorically banning students from participating in athletic programs in accordance with their gender identity. *See Horne*, 115 F.4th at 1109; *Hecox*, 104 F.4th at 1083-85. Therefore, Defendants cannot show that "no set of circumstances exists under which" Bylaw 300.D is valid—and thus Bylaw 300.D cannot facially violate the Equal Protection Clause. *See Salerno*, 481 U.S. at 745.

126. Based on the foregoing, Bylaw 300.D does not facially violate the Equal Protection Clause, as Defendants assert.

127. An order declaring that Bylaw 300.D does not, on its face, violate the Equal Protection Clause will clarify the rights and obligations of the parties and, therefore, pursuant to 28 U.S.C. § 2201(a), is appropriate to resolve this controversy.

## COUNT II

### Ultra Vires

### (Against All Defendants)

128. Plaintiff State of California incorporates by reference the foregoing paragraphs of this Complaint as if set forth at length.

129. An agency cannot take any action that exceeds the scope of its constitutional or statutory authority.

130. Federal courts possess the power in equity to "grant injunctive relief . . . with respect to violations of federal law by federal officials." *Armstrong v. Exceptional Child Ctr., Inc.*, 575 U.S. 320, 326-27 (2015). The Supreme Court has repeatedly allowed equitable relief against federal officials who act "beyond th[e] limitations" imposed by federal statute. *Larson v. Domestic & Foreign Com. Corp.*, 337 U.S. 682, 689 (1949).

21

131. Defendants have no authority under the Constitution or any statute to demand a "certification" from LEAs, unconnected to any funding agreement or formal investigation, that the LEAs will not comply with a policy of a statewide governing body for school athletics.

132. Separately, and specifically, Defendants have no authority to demand a certification based on their erroneous interpretation of the Equal Protection Clause. *See supra* Count I, ¶¶ 113-127.

133. Pursuant to 28 U.S.C. § 2201(a), California is entitled to a declaration that Defendants acted ultra vires by issuing the Certification Demand Letter and that California LEAs are not obligated to respond thereto.

134. California is further entitled to a preliminary and permanent injunction prohibiting Defendants from (1) acting on the Certification Demand Letter or (2) making any similar certification demands.

**COUNT III**

**Spending Clause: Lack of Clear Notice**

**(U.S. Const. art. I, § 8, cl. 1; Against All Defendants)**

135. Plaintiff State of California incorporates by reference the foregoing paragraphs of this Complaint as if set forth at length.

136. In the alternative to Count II, *supra* ¶¶ 128-134, to the extent that the Certification Demand Letter is intended to create a condition on some as yet unidentified federal funding, California and the recipient LEAs did not have clear notice that any federal funding would be conditioned on either (1) certification that local education agencies do not follow CIF Bylaw 300.D, or (2) categorically banning K-12 students from participating in athletic programs in accordance with their gender identity (or on co-ed athletic teams).

137. Article I of the U.S. Constitution specifically grants Congress the power "to pay the Debts and provide for the common Defense and general Welfare of the United States." U.S. Const. art. I, § 8, cl. 1.

138. Incident to the spending power, "Congress may attach conditions on the receipt of federal funds." *South Dakota v. Dole*, 483 U.S. 203, 206 (1987). However, any conditions must

22

be imposed "unambiguously" to enable "States to exercise their choice knowingly, cognizant of the consequences of their participation." *Id.* at 207 (quoting *Pennhurst State Sch. & Hosp. v. Halderman*, 451 U.S. 1, 17 (1981)).

139. There is no statute that clearly states that funds provided by Defendants are conditioned on the recipient certifying to Defendants that it does not allow K-12 students to participate in athletic programs in accordance with their gender identity (or to join co-ed teams).

140. Nor is there any statute that clearly states that funds provided by Defendants are conditioned on the recipient preventing K-12 students from participating in athletic programs in accordance with their gender identity (or on co-ed athletic teams).

141. Therefore, conditioning U.S. DOJ funding to enforce a categorical ban on transgender girls in school sports would violate this limitation on the spending power, because, inter alia, California did not have "clear notice" of such a condition. *See Arlington Cent. Sch. Dist. Bd. of Educ. v. Murphy*, 548 U.S. 291, 296 (2006).

142. Additionally, to the extent that Defendants are attempting to create such a condition in the Certification Demand Letter, such a condition is unlawful because the Certification Demand Letter was issued after California accepted federal funds, and Defendants cannot "surpris[e] participating States with post acceptance or 'retroactive' conditions." *Pennhurst*, 451 U.S. at 25.

143. Pursuant to 28 U.S.C. § 2201(a), California is entitled to a declaration that federal funds are not conditioned on compliance with the Certification Demand Letter or on refusing to permit K-12 students to participate in athletic programs in accordance with their gender identity.

144. California is also entitled to a preliminary and permanent injunction barring Defendants from suspending funds or otherwise taking enforcement action against California on the basis of such a purported funding condition.

23

1

2

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

**COUNT IV**

**Spending Clause: Independent Constitutional Bar of Equal Protection Clause**

**(U.S. Const. art. I, § 8, cl. 1; U.S. Const. amend. XIV, § 1; Against All Defendants)**

145. Plaintiff State of California incorporates by reference the foregoing paragraphs of this Complaint as if set forth at length.

146. While California seeks a declaratory judgment that Bylaw 300.D does not facially violate the Equal Protection Clause, *see supra* Count I, ¶¶ 113-127, Defendants' assertions in the Certification Demand Letter go beyond Bylaw 300.D and would require that California LEAs adopt a categorical ban on transgender girls participating in athletic programs in accordance with their gender identity.

147. In the alternative to Count II, *supra* ¶¶ 128-134, to the extent that Defendants assert that the Certification Demand Letter places a new condition on some as yet unidentified financial assistance from Defendants, Defendants cannot condition any federal funding on the State or its LEAs refusing to allow K-12 students to participate in athletic programs in accordance with their gender identity, because such a funding condition would violate the Spending Clause.

148. Congress cannot use its spending power to set conditions on federal funding that "induce the States to engage in activities that would themselves be unconstitutional." *Dole*, 483 U.S. at 210.

149. Under the Equal Protection Clause, discrimination by the government based on sex and transgender status is reviewed under heightened scrutiny and is therefore presumptively unconstitutional, absent a showing that the discrimination is "substantially related to the achievement" of "important governmental objectives." *Hecox*, 104 F.4th at 1081 (quoting *United States v. Virginia*, 518 U.S. 515, 516 (1996)).

150. A categorical ban on transgender girls participating in school sports in accordance with their gender identity, as demanded by Defendants in the Certification Demand Letter, would intentionally create a sex- and gender-based classification that necessarily excludes only transgender girls in violation of the Equal Protection Clause.

151. The funding condition Defendants seek to impose on California LEAs has a discriminatory purpose, as demonstrated by the animus-laden statements and actions of the Trump campaign, the Trump administration, and Defendants leading up to the Certification Demand Letter. *See supra* ¶¶ 63-81.

152. The only government interests identified in the Certification Demand Letter are "athletic opportunities and benefits" for cisgender girls.

153. However, a sweeping exclusion of all transgender girls from participation in girls' school sports is not substantially related to an important government interest in providing girls the benefits of school sports, as it would deny participation regardless of a student's age, the type of sport, the level of competition, and whether the participants have gone through puberty, taken puberty-delaying or gender-affirming hormone therapy, or have circulating testosterone levels equivalent to cisgender girls. Most elementary school girls who are transgender, for example, have no physiological advantage over cisgender girls in school sports. Most K-12 school students do not compete in elite sports for scholarships or national titles but play on school teams to experience the health and social benefits of sports. Transgender students make up a miniscule proportion of the hundreds of thousands of students participating in school sports in California, making abstract, alarmist concerns hypothetical. Privacy concerns can be and are accommodated on a case-by-case basis.

154. In fact, a discriminatory policy would undermine the feelings of safety, belonging, respect, and cooperation necessary to maximize the benefits of school sports for all students.

155. Accordingly, forcing California LEAs to adopt a categorical ban would result in violations of the equal protection rights of transgender students, as happened in Arizona and Idaho. *See Horne*, 115 F.4th at 1109-10; *Hecox*, 104 F.4th at 1088; *see also B.P.J.*, 98 F.4th at 562.

156. Because Congress may not impose a spending condition that would induce a State to violate the Constitution, Defendants cannot demand that California LEAs impose a categorical ban on transgender girls in girls' school sports.

157. Pursuant to 28 U.S.C. § 2201(a), California is entitled to a declaration that federal funds are not conditioned on compliance with the Certification Demand Letter or on refusing to permit K-12 students to participate in athletic programs in accordance with their gender identity.

158. California is also entitled to a preliminary and permanent injunction barring Defendants from suspending funds or otherwise taking enforcement action against California on the basis of such a purported funding condition contained in the Certification Demand Letter.

**COUNT V**

**Agency Action That Is Contrary to Law, Unconstitutional, and Exceeds Statutory Authority**

**(5 U.S.C. § 706(2)(A)-(C); Against Defendants U.S. DOJ, Bondi, and Dhillon)**

159. Plaintiff State of California incorporates by reference the foregoing paragraphs of this Complaint as if set forth at length.

160. Under the Administrative Procedure Act, a court shall "hold unlawful and set aside agency action" that is "not in accordance with law," "contrary to constitutional right," or "in excess of statutory jurisdiction, authority, or limitations, or short of statutory right." 5 U.S.C. § 706(2)(A)-(C).

161. The Certification Demand Letter is reviewable as final agency action under 5 U.S.C. § 704, because (1) it definitively demands that California LEAs certify that they will not comply with Bylaw 300.D, with no indication whatsoever that this demand is in any way "merely tentative or interlocutory"; and (2) the Certification Demand Letter purports to determine California LEAs' "obligations," from which "legal consequences will flow," given Defendants' threat of legal action if California LEAs do not accede to their demands. *See U.S. Army Corps of Eng'rs v. Hawkes Co., Inc.*, 578 U.S. 590, 597 (2016) (quoting *Bennett v. Spear*, 520 U.S. 157, 177-78 (1997)).

162. As explained above, the Certification Demand Letter is contrary to law and unconstitutional because it seeks to force California LEAs to certify that they will not follow Bylaw 300.D, which is consistent with the Equal Protection Clause, and will instead categorically exclude transgender girls from girls' sports, which violates the Equal Protection Clause.

163. As explained above, because Defendants have not identified any source of authority to issue or enforce the Certification Demand Letter, the Certification Demand Letter exceeds Defendants' statutory authority.

164. As explained above, to the extent that Defendants seek to impose a new condition on California LEAs' federal funding through the Certification Demand Letter, such a condition violates the Spending Clause and is thus contrary to law and unconstitutional.

165. Pursuant to 5 U.S.C. § 705, California is entitled to a stay of the Certification Demand Letter "to preserve status or rights pending conclusion of the review proceedings."

166. Pursuant to 5 U.S.C. § 706(2), the Court must vacate the Certification Demand Letter. *See Citizens to Pres. Overton Park, Inc. v. Volpe*, 401 U.S. 402, 413-14 (1971) (noting mandatory language of § 706).

## REQUEST FOR RELIEF

WHEREFORE, Plaintiff State of California respectfully requests that this Court enter judgment in its favor and grant the following relief:

1.  Declare that the policy contained in CIF Bylaw 300.D (and the corresponding section 221.5(f) of the California Education Code), which requires LEAs to allow students to participate in athletic programs in accordance with their gender identity, does not facially violate the Equal Protection Clause;

2.  Declare that Defendants' demands in the Certification Demand Letter, which seek to categorically prohibit transgender students from participating in athletic programs in accordance with their gender identity, violate the Equal Protection Clause;

3.  Declare that California LEAs are under no obligation to respond to the Certification Demand Letter;

4.  Declare that because the certification demanded by U.S. DOJ would require California LEAs to discriminate against transgender students in violation of the Equal Protection Clause, California LEAs are obligated not to provide such certification;

27

5.  Declare that Defendants acted ultra vires in issuing the Certification Demand
    Letter;

6.  Declare that federal funds are not conditioned on compliance with the Certification
    Demand Letter, or on refusing to permit K-12 students to participate in athletic
    programs in accordance with their gender identity;

7.  Preliminarily and permanently enjoin Defendants (including any officers,
    employees, and agents thereof) from taking enforcement action on the claimed
    ground that allowing K-12 students to participate in athletic programs in
    accordance with their gender identity is a facial violation of the Equal Protection
    Clause;

8.  Preliminarily and permanently enjoin Defendants (including any officers,
    employees, and agents thereof) from acting on the Certification Demand Letter or
    making any similar certification demands;

9.  Preliminarily and permanently enjoin Defendants (including any officers,
    employees, and agents thereof) from suspending funds or otherwise taking
    enforcement action against California on any basis contemplated in the
    Certification Demand Letter;

10. Issue a stay of the effective date of the Certification Demand Letter, or other relief,
    pursuant to 5 U.S.C. § 705, to preserve status or rights pending conclusion of the
    review proceedings;

11. Vacate and set aside the Certification Demand Letter, as required by 5 U.S.C.
    § 706(2);

12. Award Plaintiff State of California reasonable costs and expenses, including
    attorneys' fees, pursuant to 28 U.S.C. § 2412; and

13. Grant such other and further relief as the Court deems just and proper.

1    Dated:  June 9, 2025                            Respectfully submitted,

2                                                    ROB BONTA
                                                     Attorney General of California
3                                                    LAURA L. FAER
                                                     Acting Senior Assistant Attorney General
4                                                    JOEL MARRERO
                                                     Supervising Deputy Attorney General
5                                                    JONATHAN BENNER
                                                     EZRA KAUTZ
6                                                    ANTHONY PINGGERA
                                                     Deputy Attorneys General

7

8

9
                                                     /s/ Edward Nugent
10                                                   EDWARD NUGENT (SBN 330479)
                                                     Deputy Attorney General
11                                                     455 Golden Gate Avenue, Suite 11000
                                                       San Francisco, CA  94102
12                                                     Telephone: (415) 229-0113
                                                       E-mail: Edward.Nugent@doj.ca.gov
13
                                                     *Attorneys for Plaintiff State of California*
14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

29

EXHIBIT A



**U.S. Department of Justice**

Civil Rights Division

---

*Office of the Assistant Attorney General*                    *950 Pennsylvania Avenue, N.W.*
*Washington, D.C. 20530*
*Tel. (202) 514-2151*

June 2, 2025

Re: California Interscholastic Federation's Bylaw 300.D

Dear Public School District:

As a member of the California Interscholastic Federation ("CIF"), and a political subdivision of the State of California, you are exposed to legal liability due to a policy CIF has enacted that violates federal law.

CIF Bylaw 300.D requires California public high schools to allow male participation in girls' interscholastic athletics: "All students should have the opportunity to participate in CIF activities *in a manner that is consistent with their gender identity, irrespective of the gender listed on a student's records*." (emphasis added). Section 300.D, however, is facially unconstitutional.

The Equal Protection Clause of the Fourteenth Amendment to the United States Constitution prohibits discrimination on the basis of sex. Knowingly depriving female students of athletic opportunities and benefits on the basis of their sex would constitute unconstitutional sex discrimination under the Equal Protection Clause. Scientific evidence shows that upsetting the historical status quo and forcing girls to compete against males would deprive them of athletic opportunities and benefits because of their sex. Therefore, you cannot implement a policy allowing males to compete alongside girls, because such a policy would deprive girls of athletic opportunities and benefits based solely on their biological sex, in violation of the Equal Protection Clause.

As a political subdivision, you have an obligation to comply with the Equal Protection Clause. **To ensure compliance and avoid legal liability, you must certify in writing by 5:00 p.m. ET on June 9, 2025, that you will not implement CIF Bylaw 300.D**. Certifications may be sent by electronic mail to Jesus.Osete@usdoj.gov and CRT.schoolcertifications@usdoj.gov or mailed to 950 Pennsylvania Avenue, N.W., Washington, DC 20530-0001.

Thank you for your cooperation.

Regards,

Harmeet K. Dhillon
Assistant Attorney General

CIF Public School District Members
Page 2

cc:     Ron Nocetti
        Executive Director
        California Interscholastic Federation
        rnocetti@cifstate.org

        David Grissom
        Commissioner
        CIF – Central Coast Section
        dgrissom@cifccs.org

        Pat Cruickshank
        Commissioner
        CIF – North Coast Section
        pcruickshank@cifncs.org

        Gail Barksdale
        Commissioner
        CIF – San Francisco Section
        barksdaleg@sfusd.edu

        Vicky Lagos
        Commissioner
        CIF – Los Angeles City Section
        vlagos@cif-la.org

        Mike West
        Commissioner
        CIF – Southern Section
        mikew@cifss.org

Scott Johnson
Commissioner
CIF – Northern Section
sjohnson@cifns.org

Ryan Tos
Commissioner
CIF – Central Section
ryantos@cifcs.org

Mike Garrison
Commissioner
CIF – Sac-Joaquin Section
mgarrison@cifsjs.org

Francisco Navarro
Commissioner
CIF – Oakland Section
francisco.navarro@ousd.org

Joe Heinz
Commissioner
CIF – San Diego Section
jheinz@cifsds.org