1   HARMEET K. DHILLON
    Assistant Attorney General
2   Civil Rights Division
    JESUS A. OSETE
3   Principal Deputy Assistant Attorney General
    ROBERT J. KEENAN (SBN 151094)
4   Senior Counsel
        U.S. Department of Justice
5       Civil Rights Division
        950 Pennsylvania Avenue, NW
6       Washington, D.C.   20530
        Telephone:   (202) 305-2566
7       E-Mail:      robert.keenan@usdoj.gov

8   CRAIG H. MISSAKIAN
    United States Attorney
9       450 Golden Gate Avenue
        Box 36055
10      San Francisco, CA   94102-3495
        Telephone:   (415) 436-7200
11      FAX:         (415) 436-6748

12  *Attorneys for Defendants*

13                    UNITED STATES DISTRICT COURT

14                  NORTHERN DISTRICT OF CALIFORNIA

15                    SAN FRANCISCO DIVISION

16  STATE OF CALIFORNIA,              )   Case No. 3:25-cv-04863-CRB
                                      )
17              Plaintiff,            )   **NOTICE OF MOTION AND MOTION TO**
                                      )   **DISMISS COMPLAINT; MEMORANDUM**
18          v.                        )   **OF POINTS AND AUTHORITIES**
                                      )
19  UNITED STATES DEPARTMENT OF       )
    JUSTICE, *et al.*,                )   [Fed. R. Civ. P. 12(b)(1), (b)(6)]
20                                    )
                Defendants.           )   DATE:    October 10, 2025
21                                    )   TIME:    10:00 a.m.
    _____ )   PLACE:   Courtroom 6, 17th Floor

22

23          PLEASE TAKE NOTICE that on Friday, October 10, 2025, at 10:00 a.m., or as soon thereafter as

24  the matter may be heard, in Courtroom 6, 17th Floor, of the United States District Court for the Northern

25  District of California, located at 450 Golden Gate Avenue, San Francisco, California, before the Honorable

26  Charles R. Breyer, Senior United States District Judge, defendants United States Department of Justice

27  ("DOJ"); Pamela Bondi, in her official capacity as the United States Attorney General; Harmeet K.

28  Dhillon, in her official capacity as the Assistant Attorney General for DOJ's Civil Rights Division; and

the United States of America (collectively, "Defendants") will, and hereby do, move for an order dismissing the complaint of plaintiff State of California for lack of subject matter jurisdiction and failure to state a claim pursuant to Federal Rules of Civil Procedure 12(b)(1) and 12(b)(6).

Defendants request an order dismissing the complaint on the following grounds: (1) the State lacks Article III standing to pursue all of its the claims for relief because it does not plausibly allege a cognizable injury traceable to DOJ's issuance of the letter at issue and has no other basis for standing; (2) the claims are not ripe because the State has suffered no injury and is not likely to suffer any injury as a result of DOJ's issuance of the letter; (3) Count Five is not reviewable and fails to state a claim under the Administrative Procedures Act, 5 U.S.C. § 706(2)(A)-(C), because the letter does not constitute a "final agency action" and whether DOJ takes an enforcement action against any school district regarding the issue addressed in the letter is a matter committed to DOJ's discretion; and (4) the "ultra vires" claims (Counts Two and Three) are not reviewable and fail to state a claim because they allege no violation of a specific statutory prohibition and ignore the availability of other means of judicial review.

This Motion is based on this Notice; the attached Memorandum of Points and Authorities; the pleadings, records, and files in this case; other matters of which the Court may take judicial notice; and such other argument and evidence as may be presented before the Court rules on the Motion.

DATE:  August 22, 2025.

Respectfully submitted,

CRAIG H. MISSAKIAN
United States Attorney

HARMEET K. DHILLON
Assistant Attorney General
Civil Rights Division

JESUS A. OSETE
Principal Deputy Assistant Attorney General

 */s/ Robert J. Keenan*

_____
ROBERT J. KEENAN
Senior Counsel

*Attorneys for Defendants*

# **TABLE OF CONTENTS**

INTRODUCTION ...................................................................................................................1

ISSUES PRESENTED & SUMMARY OF ARGUMENT ....................................................1

STATEMENT OF FACTS .......................................................................................................2

    A.    The Equal Protection Clause & Girls' High School Sports ..............................2

    B.    Executive Order to Preserve Integrity and Fairness of Female Sports Programs ...............3

    C.    DOJ's Advisory Letter ......................................................................................3

    D.    The State's Complaint .......................................................................................4

LEGAL STANDARD ..............................................................................................................5

ARGUMENT ...........................................................................................................................5

I.    The State Lacks Standing to Assert All of Its Claims for Relief ...............................5

    A.    Count One: The Equal Protection Claim ..........................................................7

    B.    Count Two: The "Ultra Vires" Claim .............................................................14

    C.    Counts Three & Four: The Spending Clause Claims ......................................15

    D.    Count Five: The APA Claim ...........................................................................16

II.    The State's Claims Are Not Ripe For Adjudication .................................................16

III.    Count Five: The APA Claim Is Not Reviewable .....................................................18

    A.    No Final Agency Action .................................................................................19

    B.    Any Future Enforcement Action Against California School Districts Is Committed To DOJ's Discretion ..............................22

IV.    Counts Two and Three: The State's "Ultra Vires" Claims Are Not Reviewable ...............23

CONCLUSION ......................................................................................................................24

1

## <u>TABLE OF AUTHORITIES</u>

2

**CASES**

3
*Advanced Integrative Medical Science Institute, PLLC v. Garland*,
   24 F.4th 1249 (9th Cir. 2022) ................................................................ 20

4
*Alfred L. Snapp & Son, Inc. v. Puerto Rico ex rel. Barez*,
   458 U.S. 592 (1982)................................................................ 8, 9, 11

5

6
*AT&T Co. v. EEOC*,
   270 F.3d 973 (D.C. Cir. 2001) ................................................................ 20

7
*Bell Atlantic Corp. v. Twombly*,
   550 U.S. 544 (2007) ................................................................ 5

8

9
*Bell v. New Jersey*,
   461 U.S. 773 (1983) ................................................................ 19

10
*Bennett v. Spear*,
   520 U.S. 154 (1997) ................................................................ 19, 22

11

12
*City of San Diego v. Whitman*,
   242 F.3d 1097 (9th Cir. 2001) ................................................................ 20

13
*Clapper v. Amnesty International USA*,
   568 U.S. 398 (2013) ................................................................ 7, 13, 16

14

15
*Clark v. Ariz. Interscholastic Association (Clark II)*,
   886 F.2d 1191 (9th Cir. 1989) ................................................................ 2

16
*Clark v. Arizona Interscholastic Association (Clark I)*,
   695 F.2d 1126 (1982) ................................................................ 2

17

18
*Craig v. Boren*,
   429 U.S. 190 (1976)................................................................ 2

19
*DaimlerChrysler Corp. v. Cuno*,
   547 U.S. 332 (2006) ................................................................ 6

20

21
*Dep't of Commerce v. New York*,
   588 U.S. 752 (2019) ................................................................ 22

22
*Fairchild v. Hughes*,
   258 U.S. 126 (1922) ................................................................ 15

23

24
*Friends of Earth, Inc. v. Laidlaw Environmental Service TOC, Inc.*,
   528 U.S. 167 (2000) ................................................................ 6

25
*Haaland v. Brackeen*,
   599 U.S. 255 (2023) ................................................................ *passim*

26

27
*Harrison v. Jefferson Parish School Board*,
   78 F.4th 765 (5th Cir. 2023) ................................................................ 6

28

*Holistic Candlers & Consumers Association v. FDA,*
  664 F.3d 940 (D.C. Cir. 2012) ................................................................... 21

*Independent Equipment Dealers Association v. EPA,*
  372 F.3d 420 (D.C. Cir. 2004) ................................................................... 21

*International Union of Operating Engineers v. County of Plumas,*
  559 F.3d 1041 (9th Cir. 2009) ..................................................................... 5

*Kelerchian v. Bureau of Alcohol, Tobacco, Firearms & Explosives,*
  655 F. Supp. 3d 334 (E.D. Pa. 2023) .................................................. 21, 22

*Labor Council for Latin Am. Advancement v. EPA,*
  12 F.4th 234 (2nd Cir. 2021) ..................................................................... 18

*Lacewell v. Off. of Comptroller of Currency,*
  999 F.3d 130 (2nd Cir. 2021) ..................................................................... 18

*Leedom v. Kyne,*
  358 U.S. 184 (1958) ................................................................................... 23

*Lewis v. Casey,*
  518 U.S. 343 (1996) ..................................................................................... 6

*Lyng v. Nw. Indian Cemetery Protective Association,*
  485 U.S. 439 (1988) ................................................................................... 13

*Lujan v. Defenders of Wildlife,*
  504 U.S. 555 (1992) ............................................................................ *passim*

*Massachusetts v. EPA,*
  549 U.S. 497 (2007) ................................................................................... 11

*Massachusetts v. Mellon,*
  262 U.S. 447 (1923) ..................................................................................... 8

*Mendiondo v. Centinela Hospital Medical Center,*
  521 F.3d 1097 (9th Cir. 2008) ..................................................................... 5

*Merrill v. Milligan,*
  142 S.Ct. 879 (2022) ................................................................................... 12

*Missouri v. Harris,*
  847 F.3d 646 (9th Cir. 2017) ..................................................................... 14

*Murthy v. Missouri,*
  603 U.S. 43 (2024) ................................................................................. 8, 12

*Nat'l Env't Dev. Assoc.'s Clean Air Project v. EPA,*
  752 F.3d 999 (D.C. Cir. 2014) ................................................................... 18

*NRC v. Texas,*
  145 S. Ct. 1762 (2025) ......................................................................... 23, 24

*Pacific Maritime Association v. NLRB,*
    827 F.3d 1203 (9th Cir. 2016) .......................................................................... 23, 24

*Reliable Automatic Sprinkler Co. v. Consumer Product Safety Commission,*
    324 F.3d 726 (D.C. Cir. 2003) ............................................................................... 21

*Renne v. Geary,*
    501 U.S. 312 (1991) ................................................................................................. 5

*Reno v. Catholic Social Services,*
    509 U.S. 43 (1993).................................................................................................. 17

*Rhea Lana, Inc. v. Department of Labor,*
    824 F.3d 1023 (D.C. Cir. 2016) ............................................................................. 21

*Safe Air for Everyone v. Meyer,*
    373 F.3d 1035 (9th Cir. 2004) ................................................................................. 5

*Safer Chemicals, Healthy Families v. EPA,*
    943 F.3d 397 (9th Cir. 2019) ................................................................................. 13

*San Francisco Herring Association v. Dep't of the Interior,*
    946 F.3d 564 (9th Cir. 2019) ................................................................................. 19

*Schering-Plough Healthcare Products, Inc. v. Schwarz Pharma, Inc.,*
    586 F.3d 500 (7th Cir. 2009) ................................................................................. 21

*Scott v. Pasadena Unified School District,*
    306 F.3d 646 (9th Cir. 2002) ................................................................................. 16

*Sierra Club v. Whitman,*
    268 F.3d 898 (9th Cir. 2001) ................................................................................. 22

*Sisseton-Wahpeton Oyate of Lake Traverse Reservation v. United States Corps of Engineers,*
    888 F.3d 906 (8th Cir. 2018) ........................................................................... 19, 20

*Solar Turbines Inc. v. Seif,*
    879 F.2d 1073 (3d Cir. 1989)........................................................................... 21, 22

*South Carolina v. Katzenbach,*
    383 U.S. 301 (1966)............................................................................................ 7, 8

*Spokeo, Inc. v. Robins,*
    578 U.S. 330 (2016)....................................................................................... 5, 6, 16

*St. Clair v. City of Chico,*
    880 F.2d 199 (9th Cir. 1989) ................................................................................... 5

*Thomas v. Anchorage Equal Rights Commission,*
    220 F.3d 1134 (9th Cir. 2000) ........................................................................... 5, 17

*United States v. Texas,*
    599 U.S. 670 (2023).......................................................................................... 6, 13

*Washington v. FDA*,
    108 F.4th 1163 (9th Cir. 2024) ........................................................................ 9, 10, 11

*White v. Lee*,
    227 F.3d 1214 (9th Cir. 2000) ................................................................................. 5

*Whitmore v. Arkansas*,
    495 U.S. 149 (1990).............................................................................................. 13

*Wild Fish Conservancy v. Jewell*,
    730 F.3d 791 (9th Cir. 2013) ................................................................................ 16

**STATUTES**

5 U.S.C. § 701(a) ........................................................................................................ 22

5 U.S.C. § 704 ...................................................................................................... 19, 24

5 U.S.C. § 706 ..................................................................................................... *passim*

20 U.S.C. § 1682 ........................................................................................................ 22

28 U.S.C. § 509 .......................................................................................................... 22

28 U.S.C. § 516 .......................................................................................................... 22

28 U.S.C. § 2201(a) ..................................................................................................... 6

28 U.S.C. § 2403 .......................................................................................................... 9

Cal. Educ. Code § 221.5(f) ......................................................................................... 13

**OTHER AUTHORITIES**

Executive Order 14168, *Defending Women from Gender Ideology Extremism and Restoring Biological Truth to the Federal Government*,
    90 Fed. Reg. 8615 (Jan. 30, 2025) ......................................................................... 3

Executive Order 14201, *Keeping Men out of Women's Sports*,
    90 Fed. Reg. 9279 (Feb. 11, 2025) ......................................................................... 3

**RULES & REGULATIONS**

Fed. R. Civ. P. 12(b)(1) ............................................................................................... 5

Fed. R. Civ. P. 12(b)(6) ............................................................................................... 5

28 C.F.R. § 0.50 ......................................................................................................... 22

1

## INTRODUCTION

2        In early June, the United States Department of Justice ("DOJ") issued a letter addressed to public

3   school districts throughout the State of California but not addressed to the plaintiff here.  The letter advised

4   them of DOJ's position regarding the legality of California Interscholastic Federation ("CIF") Bylaw

5   300.D, which requires California public high schools to allow males to participate in girls' interscholastic

6   athletics "in a manner that is consistent with their gender identity, irrespective of the gender listed on a

7   student's records." (*See* Compl., Ex. "A.")  Specifically, DOJ advised the school districts that it considers

8   Bylaw 300.D to be facially unconstitutional under the Equal Protection Clause of the Fourteenth

9   Amendment to the United States Constitution because, by forcing girls to compete against males in girls'

10  high school sports, the school districts deprive girls of equal athletic opportunities and related benefits

11  based solely on their  sex.  Thus, DOJ explained that compliance with the bylaw could expose the school

12  districts to liability under federal law.  To explore the extent of such violations within California, DOJ

13  demanded that school districts certify whether they will implement CIF Bylaw 300.D.

14        DOJ's letter was not addressed to the California Department of Education and did not call upon

15  that agency to respond to the letter.  The letter also does not threaten to sue the plaintiff State of California

16  ("the State") or to suspend any federal funding granted to the State.  The letter, in fact, makes no mention

17  of federal funding at all.  Nonetheless, just seven days after DOJ issued its letter, the State hastily and

18  prematurely filed this preemptive, "pre-enforcement" suit to drag Defendants into court even though the

19  Defendants had not sued or threatened to sue any school district and took no action to suspend the federal

20  funding of any of the school districts.  Moreover, as the State admits in its complaint, the letter does not

21  have the force and effect of law and is not binding on the State or school districts, and the districts' failure

22  to respond does not provide an independent basis for civil liability.  In short, the letter has not caused any

23  injury or threatened any imminent cognizable injury to the State or any public school district.

24        ## ISSUES PRESENTED & SUMMARY OF ARGUMENT

25        For the reasons explained below, Defendants hereby move to dismiss the complaint on the

26  following grounds: (1) the State lacks Article III standing as to all five claims for relief because it does

27  not plausibly allege a cognizable injury traceable to DOJ's letter and has no other basis for standing;

28  (2) the claims are not ripe because no injury has occurred as a result of DOJ's issuance of the letter and

DOJ has not taken or threatened to take any enforcement action against any school district for non-compliance with the letter; (3) Count Five is not reviewable and fails to state a claim under the Administrative Procedures Act, 5 U.S.C. § 706(2)(A)-(C), because the letter does not constitute a "final agency action" and whether DOJ takes an enforcement action against any public school district regarding the issue addressed in the letter is a matter committed to DOJ's discretion; and (4) the "ultra vires" claims (Counts Two and Three) are not reviewable and fail to state a claim because they allege no violation of a specific statutory or constitutional prohibition and ignore the availability of other forms of review.

## STATEMENT OF FACTS

### A.    The Equal Protection Clause & Girls' High School Sports

The Equal Protection Clause has long been construed to protect women and girls from various forms of sex discrimination. *See Craig v. Boren*, 429 U.S. 190, 197 (1976). In 1982, the Ninth Circuit acknowledged what was then an unremarkable fact — namely, that there are "physiological differences" between males and females — and it held that a rule barring all male students from participating in girls' high school sports programs did not violate the Equal Protection Clause. *See Clark v. Arizona Interscholastic Association (Clark I)*, 695 F.2d 1126, 1131 (1982); *Clark v. Ariz. Interscholastic Association (Clark II)*, 886 F.2d 1191, 1192, 1194 (9th Cir. 1989) (same result). As the Ninth Circuit noted, the claimed governmental interest in "redressing past discrimination against women in athletics and promoting equality of athletic opportunity between the sexes" was unquestionably "legitimate and important," and the challenged rule was "substantially related to [that] interest." *Clark I*, 695 F.2d at 1131 ("[D]ue to average physiological differences, males would displace females to a substantial extent if they were allowed to compete for positions on the volleyball team. Thus, athletic opportunities for women would be diminished.").

In recent years, however, many educational institutions and athletic associations have allowed males to compete in girls' and women's sports. (Compl. ¶ 7.) In some states, such as California, that has been promoted by certain public officials and the governing bodies of various athletics associations. (*Id.* ¶¶ 1, 2, 58.) This has generated increasing concern among the public and comment by concerned leaders and citizens. (*Id.* ¶¶ 68, 82, 152.)

### B.  Executive Order to Preserve Integrity and Fairness of Female Sports Programs

On February 5, 2025, out of concern for the equal rights and opportunities of women and girls, the President issued Executive Order 14201, *Keeping Men out of Women's Sports*, 90 Fed. Reg. 9279 (Feb. 11, 2025) ("Sports Order").  The Order states that "allow[ing] men to compete in women's sports . . . is demeaning, unfair, and dangerous to women and girls, and denies women and girls the equal opportunity to participate and excel in competitive sports."  *Id*. § 1.  The Order incorporates the time-honored and scientifically-based definitions of "sex" set forth in Executive Order 14168, *Defending Women from Gender Ideology Extremism and Restoring Biological Truth to the Federal Government*, 90 Fed. Reg. 8615 (Jan. 30, 2025).  *See* Exec. Order 14201, § 2.

The Sports Order sets forth the President's policy of "oppos[ing] male competitive participation in women's sports" because of safety, fairness, and ensuring "women and girls the equal opportunity to participate and excel in competitive sports."  Exec. Order 14201, § 1.  In reference to Title IX, the President further declared that under Title IX "educational institutions receiving Federal funds cannot deny women an equal opportunity to participate in sports." *Id*.  By incorporating Executive Order 14168's definition of "sex," the Sports Order also reaffirmed that Title IX's use of term "sex" means biological sex and not gender identity.  *Id*. § 2.

The President's Sports Order authorizes and directs the Attorney General, in coordination with the Secretary of Education, to (1) "take all appropriate action to affirmatively protect all-female athletic opportunities and thereby provide the equal opportunity guaranteed by Title IX"; and (2) "prioritize Title IX enforcement actions against educational institutions . . . that deny female students an equal opportunity to participate in sports and athletic events by requiring them, in the women's category, to compete with or against . . . males."  *See* Exec. Order 14201, § 3.  The President also directed the Attorney General and Education Secretary to "review grants to educational programs and, where appropriate, rescind funding to programs that fail to comply" with the policy of the United States.  *Id*.

### C.  DOJ's Advisory Letter

On June 2, 2025, Assistant Attorney General Harmeet K. Dhillon issued a letter addressed to public school districts throughout the State of California.  (Compl., Ex. "A.")  The letter advised as follows:

As a member of the California Interscholastic Federation ("CIF"), and a political subdivision of the State of California, you are exposed to legal liability due to a policy CIF has enacted that violates federal law.

CIF Bylaw 300.D requires California public high schools to allow male participation in girls' interscholastic athletics: "All students should have the opportunity to participate in CIF activities *in a manner that is consistent with their gender identity, irrespective of the gender listed on a student's records*." (emphasis added). Section 300.D, however, is facially unconstitutional.

The Equal Protection Clause of the Fourteenth Amendment to the United States Constitution prohibits discrimination on the basis of sex. Depriving female students of athletic opportunities and benefits on the basis of their sex would constitute unconstitutional sex discrimination under the Equal Protection Clause. Scientific evidence shows that upsetting the historical status quo and forcing girls to compete against males would deprive them of athletic opportunities and benefits because of their sex. Therefore, you cannot implement a policy allowing males to compete alongside girls, because such a policy would deprive girls of athletic opportunities and benefits based solely on their biological sex, in violation of the Equal Protection Clause.

Finally, the letter advised that, as state actors, school districts have an obligation to comply with the Constitution and called on them to confirm whether they intended to implement the CIF bylaw:

As a political subdivision, you have an obligation to comply with the Equal Protection Clause. To ensure compliance and avoid legal liability, you must certify in writing by 5:00 p.m. ET on June 9, 2025, that you will not implement CIF Bylaw 300.D. Certifications may be sent by [mail or] electronic mail to [DOJ's Civil Rights Division].

**D.    The State's Complaint**

On June 9, 2025, the State filed the Complaint in this case, which asserts five claims for declaratory and injunctive relief. Count One seeks a declaration that CIF Bylaw 300.D does not violate the Fourteenth Amendment's Equal Protection Clause. (Compl. ¶¶ 112-26.) Count Two seeks a declaration that Defendants' issuance of the letter is an "ultra vires" act and an injunction barring them from acting on the letter or making "any similar" demand. (*Id*. ¶¶ 127-33.) Presented as "alternative[s] to Count II," Counts Three and Four seek an injunction barring Defendants from suspending "as yet unidentified" federal funding for school districts that allow, or fail to certify that they do not allow, males to participate in girls' sports based on allegations that no statute provides "clear notice" of those conditions for funding (Count Three) and those conditions would require the school districts to violate the Equal Protection Clause

(Count Four).  (*Id.* ¶¶ 134-57.)  Count Five seeks declaratory and injunctive relief under the Administrative Procedure Act, 5 U.S.C. § 706(2), on grounds that essentially track the first four claims, namely, that DOJ's letter exceeds Defendants' statutory authority (*i.e.*, is ultra vires) and is contrary to law (*i.e.*, the Equal Protection Clause and implied limits of the Spending Clause).  (*Id.* ¶¶ 158-65.)

## LEGAL STANDARD

Under Article III, if a plaintiff lacks standing or if a case is not ripe for adjudication, no "Case or Controversy" exists, *Thomas v. Anchorage Equal Rights Commission*, 220 F.3d 1134, 1139 (9th Cir. 2000) (en banc), and a federal court thus lacks subject matter jurisdiction, *see, e.g., White v. Lee*, 227 F.3d 1214, 1242 (9th Cir. 2000) ("standing . . . pertain[s] to a federal court's subject-matter jurisdiction"); *St. Clair v. City of Chico*, 880 F.2d 199, 201 (9th Cir. 1989) ("Whether a claim is ripe for adjudication goes to a court's subject matter jurisdiction …").  Dismissal is appropriate under Fed. R. Civ. P. 12(b)(1) if the district court lacks subject matter jurisdiction over the asserted claims.  *See International Union of Operating Engineers v. County of Plumas*, 559 F.3d 1041, 1043-44 (9th Cir. 2009).  A Rule 12(b)(1) challenge "may be facial or factual." *Safe Air for Everyone v. Meyer*, 373 F.3d 1035, 1039 (9th Cir. 2004).  "In a facial attack," the question is whether "the allegations contained in a complaint are insufficient on their face to invoke federal jurisdiction." *Id*.

Rule 12(b)(6) authorizes dismissal for failure to state a claim upon which relief can be granted. *See* Fed. R. Civ. P. 12(b)(6).  Dismissal is appropriate "where the complaint lacks a cognizable legal theory or sufficient facts to support a cognizable legal theory." *Mendiondo v. Centinela Hospital Medical Center*, 521 F.3d 1097, 1104 (9th Cir. 2008).  "[F]actual allegations must be enough to raise a right to relief above the speculative level." *Bell Atlantic Corp. v. Twombly*, 550 U.S. 544, 570 (2007).

## ARGUMENT

## I.    The State Lacks Standing to Assert All of Its Claims for Relief

Under Article III's "Case" or "Controversy" requirement, a plaintiff who seeks to invoke federal jurisdiction bears the burden of establishing "the irreducible constitutional minimum" of standing. *Spokeo, Inc. v. Robins*, 578 U.S. 330, 338 (2016).  Courts "presume that federal courts lack jurisdiction unless the contrary appears affirmatively from the record." *Renne v. Geary*, 501 U.S. 312, 316 (1991).

1    "[A] plaintiff must demonstrate standing for each claim he seeks to press." *DaimlerChrysler Corp.*

2    *v. Cuno*, 547 U.S. 332, 352 (2006) (rejecting argument that standing to pursue one claim supported

3    "supplemental" jurisdiction over other claims for which the plaintiff lacked standing); *see Lewis v. Casey*,

4    518 U.S. 343, 358 n.6 (1996) ("[S]tanding is not dispensed in gross."). Likewise, "a plaintiff must

5    demonstrate standing separately for each form of relief sought." *Friends of Earth, Inc. v. Laidlaw*

6    *Environmental Service TOC, Inc.*, 528 U.S. 167, 185 (2000). Consistent with Article III, the Declaratory

7    Judgment Act provides a statutory basis for invoking the jurisdiction of a federal court *only* "[i]n a *case*

8    *of actual controversy* within its jurisdiction." 28 U.S.C. § 2201(a) (emphasis added).

9        To have standing to sue in federal court, the plaintiff must satisfy three requirements. *Lujan v.*

10    *Defenders of Wildlife*, 504 U.S. 555, 560-61 (1992). First, "[t]he plaintiff must have suffered an injury in

11    fact — *i.e.*, an invasion of a legally protected interest which is (a) concrete and particularized, and

12    (b) actual or imminent, not conjectural or hypothetical." *Id*. at 560.[1] "Second, there must be a causal

13    connection between the injury and the conduct complained of — the injury has to be fairly traceable to

14    the challenged action of the defendant, and not the result of the independent action of some third party not

15    before the court." *Id*. "Third, it must be 'likely,' as opposed to merely 'speculative,' that the injury will

16    be 'redressed by a favorable decision.'" *Id*. at 561. "Where, as here, a case is at the pleading stage, the

17    plaintiff must clearly allege facts demonstrating each element." *Spokeo*, 578 U.S. at 338.

18        Although States are occasionally said to deserve "special solicitude" when invoking federal

19    jurisdiction, Article III's standing requirements still apply even when the plaintiff is a State. *See, e.g.*,

20    *Haaland v. Brackeen*, 599 U.S. 255, 294-96 (2023) (holding that Texas lacked standing to bring an equal

21    protection challenge against a federal statute, *i.e.*, the Indian Child Welfare Act); *United States v. Texas*,

22    599 U.S. 670, 673-74 (2023) (holding that Texas and Louisiana lacked standing to sue Department of

23    Homeland Security for new policy guideline that violates two federal statutes that require the Department

24    to arrest convicted criminal aliens pending their removal from the country); *Harrison v. Jefferson Parish*

25    *School Board*, 78 F.4th 765, 769 (5th Cir. 2023) ("[States], too, are bound by Article III's standing

26

27        [1] "A 'concrete' injury must be 'de facto'; that is, it must actually exist." *Spokeo*, 578 U.S. at 340.
    "For an injury to be 'particularized,' it must affect 'the plaintiff in a personal and individual way.'" *Id*. at

28    339 (quoting *Lujan*, 504 U.S. at 560 n.1).

requirements."). Moreover, because "the law of Article III standing … serves to prevent the judicial process from being used to usurp the powers of the political branches[,]" the Supreme Court has stressed that its standing inquiry is "especially rigorous when [(as here)] reaching the merits of the dispute would force [the Court] to decide whether an action taken by one of the other two branches of the Federal Government was unconstitutional." *Clapper v. Amnesty International USA*, 568 U.S. 398, 408 (2013).

## A.    Count One: The Equal Protection Claim

The State alleges that, by filing this case, it "seeks to protect *itself*, and California *K-12 schools* and *students*, by *preventing harms threatened* by Defendants' … *attempt* to force California LEAs to adopt [Defendants]' position" that the Equal Protection Clause bars schools from allowing male students to participate in girls' sports activities. (Compl. ¶ 23 (emphases added).) It further alleges that "[t]hose harms" — *i.e.*, "threatened" harms — "include injury to California's proprietary, sovereign, and quasi-sovereign interests." (*Id*.) No actual or concrete harms are alleged anywhere in the complaint.

Further, the State lacks standing to raise an equal-protection challenge to the DOJ's advisory letter. The State has no equal protection rights of its own. It cannot, as a matter of law, invoke the equal protection rights of its residents in *parens patriae* in a suit against the Federal Government. And the complaint alleges no other cognizable injury suffered by the State that is sufficient to invoke this Court's jurisdiction as to Count One.

### 1.    States Have No Equal Protection Rights

To begin with, it is settled that a State "has no equal protection rights of its own." *Haaland*, 599 U.S. at 294 (citing *South Carolina v. Katzenbach*, 383 U.S. 301, 323 (1966) ("The word 'person' in the context of the Due Process Clause of the Fifth Amendment cannot, by any reasonable mode of interpretation, be expanded to encompass the States of the Union[.]")); *see* U.S. Const. amend. XIV, § 1 (providing that no State shall "deny to any *person* within its jurisdiction the equal protection of the laws" (emphasis added)). Thus, in this case, the State cannot — and does not — allege that it has suffered an injury to any right that it has to equal protection of the laws; it has none to injure. *Haaland*, 599 U.S. at 294.

### 2. *Parens Patriae* Standing Is Unavailable

It is also well-established that a State "cannot assert equal protection claims on behalf of its citizens because '[a] State does not have standing as *parens patriae* [(*i.e.*, parent of the country)] to bring an action against the Federal Government.'" *Haaland*, 599 U.S. at 294-95 (citing *Alfred L. Snapp & Son, Inc. v. Puerto Rico ex rel. Barez*, 458 U.S. 592, 610 n.16 (1982) (same)); *Murthy v. Missouri*, 603 U.S. 43, 76 (2024) (same); *Katzenbach*, 383 U.S. at 324 ("Nor does a State have standing as the parent of its citizens to invoke these constitutional provisions against the Federal Government, the ultimate *parens patriae* of every American citizen.").

These cases are based on the Supreme Court's decision in *Massachusetts v. Mellon*, 262 U.S. 447, 485-86 (1923). In *Mellon*, Massachusetts sued the U.S. Treasury Secretary on behalf of its residents to vindicate their interests against being subjected to the provisions of an allegedly unconstitutional federal statute, *i.e.*, the Maternity Act of 1921, which afforded additional federal funding to States if they complied with certain healthcare mandates. *Id.* at 485-86. The Court held, however, that the State lacked standing to challenge the Act *parens patriae* on behalf of its residents:

> While the State, under some circumstances, may sue in that capacity [(*e.g.*, as *parens patriae* against a private party or another state)] for the protection of its citizens, it is no part of its duty or power to enforce their rights in respect of their relations with the Federal Government. In that field, it is the United States, and not the State, which represents them as *parens patriae*."

*Id.* at 485-86 (citation omitted).

*Haaland* is instructive and dispositive on this issue. In *Haaland*, Texas joined with Texas residents to challenge the Indian Child Welfare Act's ("ICWA") discriminatory child-placement preferences, which require an Indian child to be placed with an Indian caretaker if one is available, even if placement with a non-Indian caretaker was in the best interest of the child. 599 U.S. at 264. Based on the "settled rules" set forth above, which made "the issue open and shut," the Court held that "Texas . . . cannot assert equal protection claims on behalf of its citizens[.]" *Id.* at 294-95.

In this case, the State tacitly attempts to invoke standing based on a *parens patriae* theory. The complaint alleges the State's concern about the *risk* of injury to the equal-protection rights of "*transgender students*" (not to the State) *if* the views expressed in the DOJ letter were implemented within the State of

California.  (Compl. ¶¶ 94-96, 98, 105.)  The State further alleges that the complaint was filed to, among other things, "protect transgender students" from those "threatened harms."  (*Id*. ¶ 23.)  Under *Haaland*, these allegations do not provide the State with Article III standing to champion the constitutional rights of its residents against the Federal Government.  *Haaland*, 599 U.S. at 294.

### 3.    The State Has Suffered No Actual, Concrete, or Threatened Injury to Any Cognizable Interest of Its Own

"Interests of private parties are obviously not in themselves sovereign interests, and they do not become such simply by virtue of the State's aiding in their achievement.  In such situations, the State is no more than a nominal party."  *Snapp*, 458 U.S. at 602.  And that is not enough to provide the State with an independent basis for standing.  *Id*. at 607.

The State thus tries to establish standing for the equal protection claim by alleging that DOJ's advisory letter threatens harm to the State's own "proprietary, sovereign, and quasi-sovereign interests." (Compl. ¶¶ 23.)[2]  The State alleges that the letter threatens to "nullify California law" and interfere with the State's effort to protect the health and safety of "transgender students" by "requir[ing] California LEAs" to discriminate against male students in violation of California law.  (*Id*. ¶¶ 88, 91, 94, 96.)  These allegations, however, also fail to establish standing under Article III.  The complaint alleges no cognizable injury to any sovereign or quasi-sovereign interest of the State.

*First*, the State's alleged sovereign interest is insufficient to establish standing.  States have a "sovereign interest" in retaining the authority to "exercise sovereign power over individuals and entities within [their] jurisdiction,' including 'the power to create and enforce a legal code.'"  *Washington v. FDA*, 108 F.4th 1163, 1176 (9th Cir. 2024) (quoting *Snapp*, 458 U.S. at 601).  One example of such an interest is the ability of a State to intervene in a pending lawsuit that directly challenges the constitutionality of a state statute.  *FDA*, 108 F.4th at 1176; *see* 28 U.S.C. § 2403(b) (providing that a State may have an opportunity to intervene in a pending federal case in which "the constitutionality of any statute of that State affecting the public interest is drawn in question" by one of the parties).

---

[2]    Apart from that passing reference to a "proprietary" interest, the Complaint does not allege infringement of any such interest, as defined by the Supreme Court.  *See Snapp*, 458 U.S. at 601 (finding "proprietary interests" are those that concern the ownership of land or participation in a business venture).

However, a State's sovereign interest provides a basis for standing only if the State's authority to govern suffers an actual injury-in-fact. *See FDA*, 108 F.4th at 1174, 1176-77; *Haaland*, 599 U.S. at 295-96; *Lujan*, 504 U.S. at 560.  In *FDA*, for example, the Ninth Circuit held that Idaho lacked standing to intervene in a lawsuit to challenge a new FDA regulation that, contrary to Idaho law, made an abortifacient available by mail and eliminated the in-person dispensing requirement.  108 F.4th at 1168-70.  Idaho alleged that the FDA regulation would "harm its sovereign interest in law enforcement by making illegal [use of the drug] harder to detect," which it alleged was "an injury to its sovereign interest in enforcing state abortion laws." *Id*. at 1176.  The Ninth Circuit deemed Idaho's allegations insufficient because they reflected only an "indirect[]" effect on state law enforcement and relied "heavily on speculation" on potential future actions of third-parties — *i.e.*, that doctors and pregnant women would break state law. *Id*. at 1176-77.

Similarly, the complaint in this case does not allege facts establishing that DOJ's letter directly and immediately injured the State's "authority to govern." *FDA*, 108 F.4th at 1177.  The State admits that "the DOJ's assertions" regarding CIF Bylaw 300.D's legality "are not themselves law."  (Compl. ¶ 84.) Thus, the letter cannot fairly be said to nullify or preempt California law.  The alleged harms to the State's sovereign interests are also clearly speculative and hypothetical.  The complaint repeatedly refers to DOJ's assertions as "*threat[s]*" and decries what "*would*" be required of "California LEAs" *if* Defendants' "*attempts* to rewrite federal law" were enacted.  (*Id*. ¶¶ 86-94.)  Moreover, DOJ's letter was not addressed to the State or any state official, made no demands on any state official, and did not address the constitutionality of any California statute.  (*See* Compl., Ex. "A.")  Nor did it command any school district to cease implementation of Bylaw 300.D or threaten any imminent lawsuit or administrative enforcement action against any school district.  Rather, the letter simply advised the school districts of DOJ's view regarding the constitutionality of the bylaw, noted the potential for "legal liability" — not a loss of federal funding, and demanded to know simply whether the school would implement the bylaw.  (*Id*.)

The fact that state and federal law may be in conflict on a given issue does not, without more, create Article III standing.  In *Haaland*, Texas made claims similar to California's here to support its claim for standing to challenge the ICWA.  *Haaland*, 599 U.S. at 295.  In arguments that the Court dismissed as "creative," Texas claimed that the ICWA "injure[d] Texas by requiring it to break its promise to its citizens

that it will be colorblind in child-custody proceedings." *Id*. In other words, it argued that the "ICWA forces Texas to violate its own constitutional obligations" and to "discriminate against its citizens or lose federal funds." *Id*. The Court rejected the arguments, noting that "[t]his is not the kind of 'concrete' and 'particularized' 'invasion of a legally protected interest' necessary to demonstrate an 'injury in fact.'" *Id*. (quoting *Lujan*, 504 U.S. at 560). "Were it otherwise," the Court explained, "a State would always have standing to bring constitutional challenges when it is complicit in enforcing federal law" that is allegedly in conflict with state law. *Id*. As to risk of losing federal funding, the Court rejected it because Texas did not show that the funding was conditioned on its compliance with the ICWA's discriminatory child-placement rule. *Id*. at 295-96.

For the same reasons, the State's allegations here that "California LEAs" might someday be required to bar male students from participating in girls' sports, contrary to State law and the State's own view of the Equal Protection Clause, do not allege "the kind of 'concrete' and 'particularized' 'invasion of a legally protected interest' necessary to demonstrate an 'injury in fact.'" *Haaland*, 599 U.S. at 295-96. The complaint rests entirely on speculation and conjecture and not any imminent threat to the State's sovereign interests.

*Second*, the State's reliance on the asserted quasi-sovereign interest in the health and welfare of "transgender students" is legally insufficient to establish standing. A State does have "a quasi-sovereign interest in the health and well-being — both physical and economic — of its residents *in general*." *Snapp*, 458 U.S. at 607 (emphasis added). And, in some cases, "States have standing to sue the Federal Government based on … 'quasi-sovereign interests' that 'concern *the State as a whole*." *FDA*, 108 F.4th at 1177 (emphasis added) (citing *Massachusetts v. EPA*, 549 U.S. 497, 520 n.17 (2007) (holding that Massachusetts had standing to challenge EPA's refusal to regulate greenhouse gases because the State alleged that climate-change caused actual and ongoing harm to the State's environment, and thus to all of its residents)). But due to the *Mellon* rule, such quasi-sovereign interests *do not provide* States with "standing to sue the federal government in a third-party *parens patriae* capacity based on alleged injuries 'to an identifiable group of individual residents.'" *FDA*, 108 F.4th at 1177-78 (quoting *Snapp*, 458 U.S. at 607). A quasi-sovereign interest supports standing only if it is truly "a distinct interest of the State as a

1    whole." *See FDA*, 108 F.4th at 1177-78 (quoting *Snapp*, 458 U.S. at 607 (the challenged behavior must

2    injure a "substantial segment of [the State's] population").

3    Thus, in its recent *FDA* decision, the Ninth Circuit rejected Idaho's effort to establish standing

4    based on its quasi-sovereign interest in protecting pregnant women and unborn children from the

5    unregulated distribution of abortifacients.  108 F.4th at 1177-78.  As the Circuit explained, Idaho's

6    "allegations concern[ed] the well-being of individual citizens — not a distinct interest of the state as a

7    whole," and it said that Idaho's attempt to rely on a quasi-sovereign interest in protecting that segment of

8    its population was a "thinly veiled attempt to circumvent the limits on parens patriae standing."  *Id.* at

9    1178 (quoting *Murthy*, 144 S.Ct. at 1996-97 (holding that States lacked standing to sue federal agencies

10   and officials for a widespread censorship regime that infringed upon First Amendment rights of the States'

11   residents)).

12   The same result must obtain here.  In its complaint, the State repeatedly admits that the number of

13   "transgender students" who participate in school-sponsored athletics in California is a "*small number*"

14   and only a "*miniscule proportion*" of the total number of all students.  (*See* Compl. ¶ 7 (emphasis added);

15   *Id.* ¶ 35 ("Transgender individuals *represent a small minority of the population* in the United States,"

16   "around 0.6% of those ages 13 and older."); *Id.* ¶ 96 (describing affected group as a "discrete and insular

17   class"); and ¶ 152 ("Transgender students make up a *miniscule proportion* of the hundreds of thousands

18   of students participating in school sports in California[.]").[3]  Thus, because the quasi-sovereign interest

19   asserted by the State relates to only a small number of individuals, it is legally insufficient to support the

20   State's standing as to Count One.

21   *Third*, beyond the lack of a cognizable injury-in-fact to any valid State interest, the complaint also

22   fails to establish that there is an *imminent* and *irreparable* risk of injury to a legitimate State interest.

23   "Although imminence is concededly a somewhat elastic concept, it cannot be stretched beyond its

24

25   _____

     [3]  This "catchy but worn-out rhetoric," *Merrill v. Milligan*, 142 S.Ct. 879, 879 (2022) (Kavanaugh,

26   J., concurring), is merely designed to prompt parents and other concerned citizens to question their good
     judgment and conclude the issue is insignificant.  The State affects the same dismissive posture here,

27   describing the public's concerns as "abstract, alarmist," and "hypothetical."  (Compl. ¶ 152.)  The State's
     admissions, however, gut its claim to sovereign and quasi-sovereign standing.  The State is plainly nothing

28   more than "a nominal party."

purpose, which is to ensure that the alleged injury is not too speculative for Article III purposes — that the injury is *certainly* impending." *Lujan*, 504 U.S. at 565, n.2 (internal quotation marks omitted). Thus, the Supreme Court has "repeatedly [said] that 'threatened injury *must be certainly impending* to constitute injury in fact,' and that '[a]llegations of *possible future* injury' are not sufficient." *Clapper*, 568 U.S. at 409 (quoting *Whitmore v. Arkansas*, 495 U.S. 149, 158 (1990) (emphases added)).

In this case, as noted above, the complaint alleges nothing but speculative, "possible future injuries" — not imminent, irreparable injuries. DOJ has not taken or threatened any administrative enforcement action against any school district based on alleged violations of the Equal Protection Clause. The State's filing of this case to force litigation of a *constitutional* equal protection claim improperly usurps Defendants' discretionary authority by simply presuming that Defendants were about to take an enforcement action against school districts based on a constitutional claim when, in fact, they have not done so and may elect not to pursue it in light of the relief available under Title IX. *See, e.g.*, *Texas*, 599 U.S. at 678-81 (holding that States lacked standing to pursue lawsuit that would require DHS to take enforcement actions, as those decisions are properly left to the discretion of the Executive Branch and not forced by premature, ill-framed federal court litigation); *see also Safer Chemicals, Healthy Families v. EPA*, 943 F.3d 397, 410 (9th Cir. 2019) ("The requirement of Article III standing aids the federal judiciary to avoid intruding impermissibly upon the powers vested in the executive and legislative branches, by preventing courts from issuing advisory opinions not founded upon the facts of a controversy between truly adverse parties.").[4]

*Finally*, the Court should not accept the State's expansive claim to standing because other more-suitable plaintiffs can assert the rights of "transgender students" in later cases, if they determine that they have been injured. In short, *if* a school district in California *actually declined* to allow a male student to

---

[4] This is not a small point. After separate efforts by the U.S. Department of Education to obtain compliance with Title IX and shortly after the filing of this suit, the United States filed suit against the CDE and CIF in the Central District of California for violations of Title IX. *See United States v. California Interscholastic Federation, et al.*, Case No. 8:25-cv-01485-CV-JDE. However, DOJ did not raise an Equal Protection Clause claim in that case and did not file the case against any school districts. Thus, beyond usurping Defendants' discretionary authority, the State's complaint also tramples on the courts' prudential doctrine of "constitutional avoidance" by forcing litigation of a constitutional claim that Defendants may elect never to pursue. *See Lyng v. Nw. Indian Cemetery Protective Association*, 485 U.S. 439, 445 (1988) ("A fundamental and longstanding principle of judicial restraint requires that courts avoid reaching constitutional questions in advance of the necessity of deciding them.").

1    participate in girls' sporting activities, the student or his parents could sue to remedy an injury to whatever

2    cognizable rights the student may have under Cal. Educ. Code § 221.5(f), the Fourteenth Amendment's

3    Equal Protection Clause, or other law.  In those circumstances, involving an actual controversy regarding

4    an alleged injury to an actual person, the availability of relief for the student makes the State's claim to

5    standing here especially inappropriate.  *See Missouri v. Harris*, 847 F.3d 646, 652 (9th Cir. 2017) ("*parens*

6    *patriae* standing is inappropriate where an aggrieved party could seek private relief").

7    **B.    Count Two: The "Ultra Vires" Claim**

8    In Count Two, the State alleges that Defendants "have no authority" under the Constitution,

9    including the Equal Protection Clause, or any statute "to demand" that school districts within the State

10    provide a "certification" — "unconnected to any funding agreement or formal investigation" — whether

11    they will comply with CIF Bylaw 300.D.  (Compl. ¶¶ 130, 131.)  Based on those allegations, the State

12    seeks a declaration that DOJ's issuance of the letter is an "ultra vires" act and that the school districts are

13    not obligated to respond to it, and it seeks an injunction barring Defendants from "acting on" the letter or

14    making any "similar" demands.  (*Id*. ¶¶ 132-33.)

15    The State has no standing to pursue Count Two's "ultra vires" claim.  The count and related factual

16    allegations (*Id*. ¶¶ 106-11) contain nothing that establishes any cognizable injury to the State.  There are

17    virtually no allegations relating to the State's interests at all — no loss of funding, no legal liability, no

18    responsibility to take any action.  Constrained by its attachment of the DOJ letter, the complaint admits

19    that the allegedly ultra vires demand was directed to school districts, not to the State.  (*Id*. ¶¶ 109-10, 130-

20    31.)  The requested certifications were to come from the school districts, not the State.  (*Id*.)  Indeed, as to

21    the requested relief, Count Two requests a declaration that "California LEAs" (not the State) "are not

22    obligated to respond" to the DOJ letter.  (*Id*. ¶ 132.)

23    None of these facts comes close to establishing standing as to Count Two.  They establish no actual

24    or imminent injury-in-fact suffered by the State.  *Lujan*, 504 U.S. at 560.  In the absence of any such

25    injury, the allegations also fail to allege a "causal connection between the injury and . . . the challenged

26    action of the defendant."  *Id*.  At best, the State alleges only a "generally available grievance about

27    government — claiming only harm to [its] and every citizen's interest in proper application of the

28    Constitution and laws, and seeking relief that no more directly and tangibly benefits [it] than it does the

public at large" — and the Supreme Court has held consistently that a claim of that type "does not state an Article III case or controversy." *Lujan*, 504 U.S. at 573-74 (collecting cases); *see, e.g., Fairchild v. Hughes*, 258 U.S. 126, 129-30 (1922) (holding that plaintiff, who was not an elections officer, lacked standing to challenge the Attorney General's threats of enforcement actions against state elections officers relating to ratification of the Nineteenth Amendment).

In short, claims that rest merely on alleged violations of "the generalized interest of all citizens in constitutional governance" do not allege a unique "particularized" injury and thus do not provide a legitimate basis for standing under Article III. *Lujan*, 504 U.S. at 576. Because Count Two alleges nothing more than that, the Court lacks subject matter jurisdiction to adjudicate the claim.

### C.    Counts Three & Four: The Spending Clause Claims

Presented as "alternative[s] to Count II," Counts Three and Four are also types of ultra vires claims, but they are both based on the hypothetical premise that the allegedly unauthorized act — *i.e.*, DOJ's demand letter — threatens "some as yet unidentified federal funding." (Compl. ¶¶ 135, 146; *see id.* ¶ 164 ("*to the extent that* Defendants seek to impose a new condition on California LEAs' federal funding through the Certification Demand Letter, such a condition violates the Spending Clause" (emphasis added)).) On that assumption, Count Three alleges that the DOJ's letter violates an implied limit of the Spending Clause because "no statute" provides "clear notice" that "funds provided by Defendants" to "*recipient LEAs*" would be "conditioned on the recipient [LEAs] certifying" that they "do[] not allow" male students to participate in girls' sports. (Compl. ¶¶ 135, 138-39.) Likewise, Count Four alleges that the DOJ letter violates another implied limit of the Spending Clause by requiring "California LEAs" (not the State) to take an action that, in the State's view, violates the Equal Protection Clause, namely, to bar male students from participating in girls' sports. (*Id.* ¶¶ 145, 146, 150, 154.)

These two Spending Clause counts must be dismissed because the State lacks standing to pursue them. First, as noted above, both claims are based on rank speculation. They do not allege that the State or any California school district has lost federal funding. Moreover, DOJ's letter makes no reference to federal funding or the termination thereof, and its reference to potential "legal liability" is not fairly construed as a threat to federal funding.

Second, each claim is alleged expressly as a hypothetical — *i.e.*, "to the extent that … some as yet unidentified federal funding" might be suspended or terminated.  (Compl. ¶¶ 135, 146.)  That fails to establish standing under Article III because it alleges an injury that is "conjectural or hypothetical," not "actual or imminent."  *Lujan*, 504 U.S. at 560; *see Clapper*, 568 U.S. at 414 (declining to endorse "standing theories that rest on speculation").

Third, the alleged potential injury is not "particularized" to the State — *i.e.*, an injury that the State has suffered, or will imminently suffer, "in a personal and individual way."  *Spokeo*, 578 U.S. at 339 (quoting *Lujan*, 504 U.S. at 560 n.1).  Counts Three and Four are based on nothing more than a "generally available grievance" about an alleged insult to the general interest in constitutional governance, which, as noted above regarding Count Two, is not the type of claim that states an Article III case or controversy.  *Lujan*, 504 U.S. at 573-74, 576.

### D.    Count Five: The APA Claim

In addition to satisfying the APA's statutory provisions, a plaintiff must also "demonstrate[] constitutional standing" to pursue an APA claim.  *See Wild Fish Conservancy v. Jewell*, 730 F.3d 791, 796 (9th Cir. 2013) (focusing primarily on plaintiffs' statutory standing); *Lujan*, 504 U.S. at 559 (holding that plaintiffs lacked constitutional standing in case brought under the APA and another statute).  We address the State's failure to satisfy the APA's statutory provisions below in Section III.

As to constitutional standing under Article III, Count Five basically incorporates the same claims asserted in Counts One through Four (*see* Compl. ¶¶ 161-63) and dresses them in statutory garb by claiming that DOJ's demand letter is: (1) "contrary to a constitutional right" (*i.e.*, the Equal Protection Clause, as alleged in Count One); (2) "in excess of statutory . . . authority" (*i.e.*, an "ultra vires" act, as alleged in Counts Two and Three); and (3) "not in accordance with law" (as alleged in Counts One-Four), all in violation of 5 U.S.C. § 706(2)(A)-(C).  Thus, the State lacks standing as to Count Five because the APA claim suffers from all of the constitutional infirmities detailed above regarding the other claims.

## II.    The State's Claims Are Not Ripe For Adjudication

The ripeness doctrine effectuates Article III's jurisdictional limitations by requiring courts to avoid the "premature adjudication" of matters that have not ripened into actual "cases or controversies."  *Scott v. Pasadena Unified School District*, 306 F.3d 646, 662 (9th Cir. 2002).  When, as here, the plaintiff has

1    suffered no injury-in-fact, the ripeness requirement may overlap to a degree with the standing analysis.

2    *Thomas*, 220 F.3d at 1138. And that is certainly true here. As explained above, the complaint fails to

3    allege that the State has suffered any cognizable injury-in-fact or any imminent, clearly impending injury

4    as a result of the letter. For those very same reasons, the State's claims must also be dismissed because

5    they are not "ripe" for review.

6        The State's claims lack ripeness for at least two other reasons. First, the State only seeks injunctive

7    and declaratory relief, which are "discretionary" in nature, and "courts traditionally have been reluctant

8    to apply them to administrative determinations unless these arise in the context of a controversy 'ripe' for

9    judicial resolution" — "that is to say, unless the *effects* of the administrative *action challenged* have been

10   '*felt in a concrete way by the challenging parties*." *Reno v. Catholic Social Services*, 509 U.S. 43, 57

11   (1993) (emphases added) (citations and internal quotations omitted). Here, the State's complaint concerns

12   a letter that does not constitute or purport to be a final administrative action and does not threaten any

13   action against the State whatsoever. Thus, the claims are not ripe because the *challenged action* (the letter)

14   has not caused any "effects" (*i.e.*, harm) that have been "felt in a concrete way" by the State.

15       Relatedly, the State's claims also suffer from the fact that they are "pre-enforcement" claims that

16   seek to challenge an enforcement action before one is ever undertaken. As noted above, DOJ's letter does

17   not "communicate[] a specific warning or threat to initiate proceedings" against the school districts to

18   whom it's addressed. *Thomas*, 220 F.3d at 1139. The lack of threats and warnings is a critical fact which

19   indicates that a pre-enforcement claim is not ripe. *Id.* Because the letter does not require the State to do

20   anything at all, it does not present the State with any dilemma requiring a "concrete" response. *Id.*

21       As to the claims that rest solely on the State's concerns about the loss of federal funding (*i.e.*,

22   Counts Two through Four), the ripeness problem is really hard to miss. Throughout the complaint, the

23   State openly admits that it's unclear whether DOJ's letter and demand for a certification threatens or is

24   even connected with any federal funding for the school districts. For example, the State repeatedly uses

25   conditional language when alleging its concern about school districts' loss of funding— *i.e.*, "*to the extent*

26   *that*" DOJ's letter "seeks to place a [new] condition on federal funding." (Compl. ¶¶ 107, 111, 135, 141,

27   146.) In Count Two, the State further admits that DOJ's letter may well be "*unconnected* to any funding

28

1    agreement" with the school districts.  (Compl. ¶ 130.)  It is difficult to imagine any claim being more

2    hypothetical and lacking in ripeness.

3          Even if the State's claims were ripe under Article III standards (and they are not), the claims should

4    nonetheless be dismissed because they are not prudentially ripe.  "Under the doctrine of prudential

5    ripeness, courts will decline to review administrative action that would otherwise be reviewable under

6    constitutional and statutory standards because, upon a balancing of the pertinent interests, it is preferable

7    for judicial review to await a more advanced state of administrative consideration."  *Labor Council for*

8    *Latin Am. Advancement v. EPA ("LCLAA")*, 12 F.4th 234, 252–53 (2nd Cir. 2021); *see Nat'l Env't Dev.*

9    *Assoc.'s Clean Air Project v. EPA*, 752 F.3d 999, 1007–08 (D.C. Cir. 2014) ("Even when an agency has

10   taken final action, a court may refrain from reviewing a challenge to the action if the case is unripe for

11   review.").  In the administrative context, the ripeness doctrine "protect[s] the agencies from judicial

12   interference until an administrative decision has been formalized and its effects felt in a concrete way by

13   the challenging parties." *Lacewell v. Off. of Comptroller of Currency*, 999 F.3d 130, 148 (2nd Cir. 2021)

14   (cleaned up).

15         The prudential ripeness doctrine involves a two-part balancing inquiry: whether the issues are "fit"

16   for judicial review, and whether withholding a decision would cause substantial hardship on the parties.

17   *LCLAA*, 12 F.4th at 252–53.  In this case, the issues are not "fit" for review.  (Comp. ¶ 84.)  As is typical

18   before DOJ decides whether to commence litigation, the DOJ letter at issue here simply warned the school

19   districts and sought clarification about how they were administering girls' high-school sports programs.

20   The consummation of that administrative process would be a decision by Defendants (not the State)

21   whether to initiate litigation.  Thus, the agency process should be allowed to unfold since it may avoid the

22   need for litigation altogether or at least narrow the issues for review.

23         Thus, all of the State's claims should be dismissed because they are not ripe for review.

24   **III.    Count Five: The APA Claim Is Not Reviewable**

25         Apart from the State's lack of standing, Count Five should also be dismissed for lack of subject

26   matter jurisdiction because DOJ's letter is not reviewable under the APA.  First, the letter is not a "final

27   agency action."  Second, the decision to pursue a future enforcement action against a school district is

28

1  committed to DOJ's sole discretion and cannot be usurped on the assumption that discretion has already

2  been exercised.

3      **A.**    **No Final Agency Action**

4      The APA authorizes a court to "set aside agency action, findings, and conclusions found to be ...

5  arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law." 5 U.S.C. § 706.

6  By its terms, however, the APA provides a right to judicial review only as to "*final* agency action[s] for

7  which there is no other adequate remedy in a court." *See* 5 U.S.C. § 704 (emphasis added). "[A] central

8  rationale of the final agency action requirement is to prevent premature intrusion into the agency's

9  deliberations[.]" *San Francisco Herring Association v. Dep't of the Interior*, 946 F.3d 564, 579 (9th Cir.

10  2019).

11      In *Bennett v. Spear*, 520 U.S. 154 (1997), the Supreme Court explained that "two conditions must

12  be satisfied for agency action to be 'final': First, the action must mark the "consummation" of the agency's

13  decision–making process — it must not be of a merely tentative or interlocutory nature.  And second, the

14  action must be one by which "rights or obligations have been determined," or from which "legal

15  consequences will flow." *Id.* at 177-78.  Courts must assess the requirement of administrative finality

16  "pragmatically," placing the challenged action in context and "focusing on whether judicial review at the

17  time will disrupt the administrative process." *Bell v. New Jersey*, 461 U.S. 773, 779 (1983).

18      In its complaint, the State claims that the DOJ letter is a "final agency action … because (1) it

19  definitively demands that [the school districts] certify that they will not comply with Bylaw 300.D, with

20  no indication" that the demand is "merely tentative or interlocutory"; and (2) the letter "purports to

21  determine [the school districts]' 'obligations.'" (Compl. ¶ 160.)  But a final agency action requires a legal

22  injury to rights or obligations, and an "an agency does not inflict [legal] injury merely by expressing its

23  view of the law." *See Sisseton-Wahpeton Oyate of Lake Traverse Reservation v. United States Corps of

24  Engineers*, 888 F.3d 906, 915 (8th Cir. 2018); *AT&T Co. v. EEOC*, 270 F.3d 973, 976 (D.C. Cir. 2001)

25  ("The Commission has not inflicted any injury upon AT&T merely by expressing its view of the law —

26  a view that has force only to the extent the agency can persuade a court to the same conclusion.").

27      Here, the DOJ letter is not a "final agency action."  The State's wordplay — *e.g.*, its use of the

28  words "definitively" and "determine" — to characterize the letter does not transform the letter into a "final

agency action."  The letter expresses the Defendants' view regarding the school districts' legal obligations, but does not purport to be a final legally-controlling "determin[ation]" of their obligations or liabilities. Indeed, the letter advised the school districts *not* that they are liable, but only that they "*are exposed to legal liability*" *if* they comply with the CIF bylaw.  (Ex. "A.")  Thus, by its own terms, the letter plainly does not "*determine*" the school districts' obligations or liabilities, "*definitively*" or otherwise.  Beyond its advisory function, the letter was merely part of a fact-finding effort to determine which school districts are complying with the bylaw and which are not.

The letter simply expressed DOJ's view of the law and required school districts to state whether they would comply with the CIF bylaw.  The letter does not impose any legal consequences, and no legal consequences flow from the letter itself.  Thus, there is nothing about the letter that qualifies it as a "final agency action."  *See Sisseton-Wahpeton Oyate Reservation*, 888 F.3d at 915 (Corps' letter explaining to Tribe how it applied the law on a prior land-use permit was not a final agency action); *AT&T Co.*, 270 F.3d at 976 (EEOC's letter advising AT&T that its personnel policy violated the law and that a failure at conciliation would lead to referral to EEOC's legal department, was not a "final" agency action).

The letter does not purport to be a final rule or regulation.  The letter does not have the force or effect of law, does not bind the school districts, and does not even bind DOJ.  Nor does a school district's failure to respond give rise to any independent civil liability.  Indeed, as the State admits in its complaint, the "assertions" in DOJ's letter "are not in themselves law."  (Compl. ¶ 84.)  The letter does not constitute a step in the rule-making process, such as a notice, solicitation for public comment, a draft rule, etc.  The letter was part of a fact-finding process — thwarted by the State (Compl. ¶ 84) — not the conclusion of it.  Moreover, the letter does not threaten to sue, or deny federal funding to, any school district in California for failing to respond to the letter or for any action to comply with CIF Bylaw 300.D.

Courts routinely find that letters like the one at issue here do not qualify as a "final agency action." As the Ninth Circuit has explained, "[a]n agency's informational document, in which 'an agency merely expresses its view of what the law requires of a party,' is not a final agency action."  *See, e.g.*, *Advanced Integrative Medical Science Institute, PLLC v. Garland*, 24 F.4th 1249, 1252 (9th Cir. 2022) ("*AIMSI*") (DEA letter, issued in response to public inquiry, was *not* a final agency action even though it declared the DEA's view that the Right-to-Try Act "did not create any additional exemptions" regarding the

administration of certain controlled substances); *City of San Diego v. Whitman*, 242 F.3d 1097 (9th Cir. 2001) ("a letter written by the EPA, stating it planned to apply the Ocean Pollution Reduction Act to the City's future application for renewal of its wastewater discharge permit," was not a final agency action).

The Ninth Circuit is in accord with other courts on this point.  *See, e.g., Rhea Lana, Inc. v. Department of Labor*, 824 F.3d 1023, 1028 (D.C. Cir. 2016) (DOL's warning letter was not a final action; noting that "[a]gencies routinely use such letters to warn regulated entities of potential violations before saddling them with expensive and demanding enforcement actions"); *Holistic Candlers & Consumers Association v. FDA*, 664 F.3d 940, 944 (D.C. Cir. 2012) (FDA warning letters about a product's noncompliance with the law did not constitute final agency action); *Independent Equipment Dealers Association v. EPA*, 372 F.3d 420, 428 (D.C. Cir. 2004) ("practical consequences, such as the threat of having to defend in an administrative hearing should the agency actually decide to pursue enforcement, are insufficient to bring an agency's conduct under [the court's] purview"); *Reliable Automatic Sprinkler Co. v. Consumer Product Safety Commission*, 324 F.3d 726, 731-32 (D.C. Cir. 2003) (agency letter announcing "preliminary determination" and requesting "voluntary corrective" measures was not final, as "the agency has not yet taken the steps required under the statutory and regulatory scheme for its actions to have any legal consequences"); *Schering-Plough Healthcare Products, Inc. v. Schwarz Pharma, Inc.*, 586 F.3d 500, 505 (7th Cir. 2009) (FDA's letters advising a company that its product was misbranded, which could cause FDA to rescind the approval, was "not final agency action"); *Solar Turbines Inc. v. Seif*, 879 F.2d 1073, 1081 (3d Cir. 1989) (EPA letter was not a final agency action because "even though the . . . letter seems to threaten civil and criminal liability upon noncompliance, no civil or criminal liabilities accrue"); *Kelerchian v. Bureau of Alcohol, Tobacco, Firearms & Explosives*, 655 F. Supp. 3d 334, 345-49 (E.D. Pa. 2023) (ATF letter to federally-licensed firearms dealer advising that his license would be revoked within 30 days due to certain felony convictions he had sustained and warning the licensee of potential criminal liability if he failed to comply with certain statutory provisions was not a "final agency action"; noting that the "letter does not impose additional criminal liabilities" and that "legal consequences flow from [the licensee]'s actions [and] applicable [law], but not from ATF's letter").

Here, the DOJ letter does not refer to Title IX or threaten the school districts with the loss of Title IX funds.  (*See* Compl., Ex. A.)  The letter only refers to the school district's obligation to comply with

the Equal Protection Clause, not Title IX.  (*Id*.)  The letter also refers only to a risk of "legal liability," not

a loss of any federal funding.  (*Id*.)  Warnings of potential legal liability are not enough to qualify a letter

as a "final agency action."  *See, e.g.*, *Solar Turbines*, 879 F.2d at 1081; *Kelerchian*, 655 F. Supp. 3d at

345-49.  But even if the school districts interpreted the letter as implicating their obligations under Title

IX, the provisions of that Act make clear that the letter is nowhere close to the type of "final" agency

action that threatened their continued receipt of federal funding.  *See generally* 20 U.S.C. § 1682.  Nothing

in the letter suggests that Defendants have taken, or were about to take, any imminent enforcement action

to terminate the Title IX funding of any school district for failure to reply to the letter or for complying

with the CIF bylaw.

### B.    Any Future Enforcement Action Against California School Districts Is Committed To DOJ's Discretion

The APA forbids judicial review of agency actions that are "committed to agency discretion by

law."  *See* 5 U.S.C. § 701(a); *Bennett*, 520 U.S. at 175.  This statutory bar also dooms Count Five.

The decision to take any future enforcement action against a school district for violation of Title

IX or the Equal Protection Clause is a decision committed to Defendants' sole discretion.  *See* 28 U.S.C.

§ 509 ("all functions . . . of the Department of Justice are vested in the Attorney General"); 28 U.S.C.

§ 516 ("the conduct of litigation in which the United States, an agency, or officer thereof is a party, or is

interested, . . . is reserved to officers of the Department of Justice, under the direction of the Attorney

General"); 28 C.F.R. § 0.50 ("Enforcement of all Federal statutes affecting civil rights," including the

"authorization of litigation in such enforcement," "shall be conducted, handled, or supervised by, the

Assistant Attorney General, Civil Rights Division").  Indeed, the Supreme Court has made clear that

whether to "institute enforcement proceedings" is a "category of administrative decisions that courts

traditionally have regarded as committed to agency discretion."  *Dep't of Commerce. v. New York*, 588

U.S. 752, 772 (2019); *cf., e.g.*, *Sierra Club v. Whitman*, 268 F.3d 898, 903 (9th Cir. 2001) ("The EPA's

decision not to take enforcement measures, like a prosecutor's decision not to indict, is one that is typically

committed to the agency's absolute discretion, such that a court would have no meaningful standard

against which to judge the agency's exercise of discretion." (cleaned up)).

Defendants have not yet elected to take any such action based on the Equal Protection Clause against any of the school districts in California for their failure to respond to the letter or their continued compliance with CIF Bylaw 300.D.  To allow the State to proceed in this case on the false premise that Defendants have exercised that discretion would improperly allow the State to usurp Defendants' authority, all in violation of § 701.

**IV.    Counts Two and Three: The State's "Ultra Vires" Claims Are Not Reviewable**

In Count Two, the State invokes the Court's equitable powers with an "ultra vires" claim alleging that — when unconnected to funding or a formal investigation — Defendants have no clear statutory or constitutional authority to demand that school districts certify that they will not implement CIF Bylaw 300.D.  (Compl. ¶¶ 130-31.)  "In the alternative to Count II," Count Three alleges that DOJ's demand for a certification is not clearly authorized by a clear statute "to the extent it" conditions funding on the school districts' compliance with the demand.  (*Id*. ¶¶ 135, 138-39.)  Each of these non-statutory ultra vires claims should, however, be dismissed for lack of subject matter jurisdiction and failure to state a claim.

The Supreme Court recently emphasized the courts' limited power to provide injunctive relief against federal agencies and officials based on non-statutory ultra vires claims.  *See NRC v. Texas*, 145 S. Ct. 1762, 1775-76 (2025) (describing such claims as a "Hail Mary Pass").  To ensure that ultra vires claims are not used as an "end-run around" judicial-review statutes like the APA, the Court has "*strictly limited* non-statutory ultra vires review to the 'painstakingly delineated procedural boundaries of *Kyne*.'"  *Id.* (emphasis added, citations omitted); *see also Leedom v. Kyne*, 358 U.S. 184, 188-89 (1958).  "'The *Kyne* exception is a narrow one,' and it does not apply simply because an agency has arguably reached 'a conclusion which does not comport with the law.'"  *NRC*, 145 S. Ct. at 1776.  Thus, courts have jurisdiction over a non-statutory ultra vires claim only if the plaintiff makes an exceedingly difficult two-part showing: (1) the "agency has taken action *entirely in excess of its delegated powers* and *contrary to a specific prohibition* in a statute"; and (2) the plaintiff is an aggrieved person who would otherwise have no "meaningful and adequate opportunity for judicial review."  *Id*. (emphases added); *see also Pacific Maritime Association v. NLRB*, 827 F.3d 1203, 1208 (9th Cir. 2016) (providing similar summary of two requirements).

1   In this case, Counts Two and Three should be dismissed because they fail to satisfy both of the

2   requirements laid out in *NRC*.  First, the claims fail to allege that DOJ's issuance of the advisory letter

3   violated "*a specific prohibition* in a statute."  *NRC*, 145 S. Ct. at 1775.  The State only offers a general

4   allegation that there is "no statute" that authorizes DOJ to issue the demand letter.  (*See, e.g.*, Compl.

5   ¶¶ 130-31, 138-39.)  That's not good enough.  Under *NRC*, the complaint must affirmatively identify the

6   "specific prohibition" in a statute that DOJ's letter clearly violates, and it fails to do so.  *Id*. at 1775; *see*

7   *also Pacific Maritime*, 827 F.3d at 1208.

8   Second, even if the State could properly show that it is an "aggrieved" party (and it cannot for the

9   same reason that it lacks standing), Counts Two and Three fail to allege that the State has no "meaningful

10  and adequate opportunity for judicial review" if the Court declines to consider those non-statutory ultra

11  vires claims.  *NRC*, 145 S.Ct. at 1776.  And they cannot do so.  The existence of the APA precludes any

12  such showing.   The APA permits judicial review of a "final agency action" that is "contrary to

13  constitutional right, power, privilege, or immunity" or "in excess of statutory jurisdiction, authority, or

14  limitations, or short of statutory right."  5 U.S.C. § 706(2); *see also* 5 U.S.C. § 704 (authorizing review

15  only of a "final agency action").  Although Count Five's APA claim suffers from fatal defects of its own

16  (as discussed below), the APA nonetheless provides a "meaningful and adequate opportunity for judicial

17  review" within the parameters that Congress has deemed appropriate, provided, of course, a claim is

18  otherwise justiciable under Article III.

19                                                    **<u>CONCLUSION</u>**

20  For all the forgoing reasons, the Court should dismiss the complaint in its entirety.

21

22

23

24

25

26

27

28