1   Rob Bonta (SBN 202668)
    Attorney General of California
2   Michael Newman (SBN 222993)
    Senior Assistant Attorney General
3   Joel Marrero (SBN 275601)
    Supervising Deputy Attorney General
4   Jonathan Benner (SBN 318956)
    Elia Herrera (SBN 293278)
5   Edward Nugent (SBN 330479)
    Ezra Kautz (SBN 330352)
6   Deputy Attorneys General
      1300 I St., Suite 125
7     P.O. Box 944255
      Sacramento, CA 94244-2550
8     Telephone: (916) 210-6346
      E-mail: Ezra.Kautz@doj.ca.gov
9   *Attorneys for Plaintiff State of California*

10              IN THE UNITED STATES DISTRICT COURT

11          FOR THE NORTHERN DISTRICT OF CALIFORNIA

12                   SAN FRANCISCO DIVISION

13

14  | **STATE OF CALIFORNIA,** | Case No. 3:25-cv-04863-CRB |
    | --- | --- |
15  | Plaintiff, | **PLAINTIFF'S MEMORANDUM OF** |
16  | | **POINTS AND AUTHORITIES IN OPPOSITION TO DEFENDANTS'** |
    | v. | **MOTION TO DISMISS** |
17  | | |
18  | **UNITED STATES DEPARTMENT OF JUSTICE, et al.,** | Administrative Procedure Act Case |
19  | Defendants. | Hearing Date: December 5, 2025 |
20  | | Time:        10:00 a.m. |
    | | Dept:        Courtroom 6 |
21  | | Judge:       Hon. Charles R. Breyer |
    | | Trial Date:  Not Set |
22  | | Action Filed: June 9, 2025 |

23

24

25

26

27

28

# TABLE OF CONTENTS

**Page**

Summary of Argument and Statement of Issues ................................................................ viii

Factual Background .......................................................................................................... 1

    A.    Statutory and Regulatory History .............................................................. 1

    B.    Trump and His Administration Target Transgender Student Athletes .................................................................................................... 1

    C.    Trump Administration Response to a California Student Participating in a High School Track Event ............................................ 2

    D.    Plaintiff's Response to the Certification Demand Letter ......................... 3

    E.    Defendants' Title IX Lawsuit Challenging Section 221.5(f) and Bylaw 300.D ........................................................................................... 3

Legal Standard ................................................................................................................. 4

Argument ......................................................................................................................... 4

    I.    Plaintiff Has Standing ....................................................................................... 4

        A.    The Certification Demand Letter Threatens California's Legally Protected Interests ................................................................................... 5

            1.    Defendants' Attempt to Override State Antidiscrimination Law Injures Plaintiff's Sovereign Interest in Creating and Enforcing a Legal Code ............................................................ 5

            2.    In California, LEAs Are Arms of the State, and So Threats to LEAs Are Threats to the State ...................................... 7

        B.    The Complaint Establishes a Pre-Enforcement Injury ............................ 8

            1.    Defendants Concede Plaintiff Is Currently "In Violation" of Their Interpretation of the Equal Protection Clause ..................... 9

            2.    On Its Face, the Letter Is a "Specific Warning or Threat," Not Merely "Advisory" ............................................................... 9

            3.    The Trump Administration Has Prioritized "Prosecution and Enforcement" Against the Participation of Transgender Girls in School-Sponsored Sports ........................................... 11

        C.    Plaintiff Is Not Asserting Third-Party Rights, But Rather Defending State Law ............................................................................................... 12

    II.    The Challenge to the Certification Demand Letter Is Ripe .............................. 13

    III.    Plaintiff's APA Claims Are Reviewable .......................................................... 15

        A.    The Certification Demand Letter Is a Final Agency Action .................... 15

        B.    The Certification Demand Letter Is Not an Action Committed to Agency Discretion .................................................................................. 18

    IV.    Plaintiff's Ultra Vires Claims Are Justiciable .................................................. 19

Conclusion ....................................................................................................................... 21

i

# TABLE OF AUTHORITIES

**Page**

**CASES**

*Advanced Med. Sci. Inst., PLLC v. Garland*
   24 F.4th 1249 (9th Cir. 2022)................................................................ 17

*Alaska Dep't of Env't Conserv. v. EPA*
   244 F.3d 748 (9th Cir. 2001)................................................................ 17

*Arizona v. Yellen*
   34 F.4th 841 (9th Cir. 2022)................................................. ix, 10, 11, 21

*Artichoke Joe's v. Norton*
   216 F.Supp.2d 1084 (E.D. Cal. Aug. 5, 2002) ...................................... 18

*Belanger v. Madera Unified Sch. Dist.*
   963 F.2d 248 (9th Cir. 1992)......................................................... viii, 7, 8

*Bennett v. Spear*
   520 U.S. 154 (1997)............................................................................ x, 16

*Biden v. Nebraska*
   600 U.S. 477 (2023)................................................................................... 8

*Bishop Paiute Tribe v. Inyo Cnty.*
   863 F.3d 1144 (9th Cir. 2017)............................................... ix, 13, 14

*Board of Governors, FRS v. MCorp Fin., Inc.*
   502 U.S. 32 (1991)................................................................................. 20

*Boire v. Greyhound Corp.*
   376 U.S. 473 (1964)............................................................................... 20

*Bowen v. Pub. Agencies Opposed to Soc. Sec.*
   477 U.S. 41 (1986).................................................................................... 7

*Butt v. California*
   4 Cal. 4th 668 (1992) ...................................................................... viii, 7

*Cal. Trucking Ass'n v. Bonta*
   966 F.3d 644 (9th Cir. 2021).......................................... ix, 9, 10, 11

*City & Cnty. of San Francisco v. Trump*
   897 F.3d 1225 (9th Cir. 2018)............................................................. 10

*City of San Diego v. Whitman*
   242 F.3d 1097 (9th Cir. 2001)............................................................. 17

## TABLE OF AUTHORITIES
### (continued)

Page

*Clapper v. Amnesty Int'l USA*
568 U.S. 398 (2013) ........................................................................................ 8

*Clark v. Arizona Interscholastic Ass'n*
695 F.2d 1126 (1982) ..................................................................................... 12

*CSI Aviation Servs., Inc. v. U.S. Dep't of Transp.*
637 F.3d 408 (D.C. Cir. 2011) ....................................................................... 18

*Dep't of Commerce v. New York*
588 U.S. 752 (2019) ........................................................................... 4, 8, 9, 18

*Diamond v. Charles*
476 U.S. 54 (1986) ........................................................................................... 5

*E. Bay Sanctuary Covenant v. Trump*
932 F.3d 742 (9th Cir. 2018) ........................................................................... 8

*Edison Electric Inst. v. EPA*
996 F.2d 326 (D.C. Cir. 1993) ....................................................................... 19

*Food & Drug Admin. v. All. for Hippocratic Med.*
602 U.S. 367 (2024) ......................................................................................... 4

*Free Enterprise Fund v. Pub. Co. Accounting Bd.*
561 U.S. 477 (2010) ....................................................................................... 21

*Gill v. U.S. Dep't of Justice*
913 F.3d 1179 (9th Cir. 2019) ....................................................................... 16

*Haaland v. Brakeen*
599 U.S. 255 (2023) ......................................................................................... 6

*Hal Roach Studios, Inc. v. Richard Feiner & Co.*
896 F.2d 1542 (9th Cir.1990) .................................................................... ix, 13

*Heckler v. Chaney*
470 U.S. 821 (1985) ....................................................................................... 18

*Ileto v. Glock, Inc.*
349 F.3d 1191 (9th Cir. 2003) ......................................................................... 4

*In re Gilead Scis. Secs. Litig.*
536 F.3d 1049 (9th Cir. 2008) ....................................................................... 10

iii

# TABLE OF AUTHORITIES
### (continued)

**Page**

*La. Pub. Serv. Comm'n v. FCC*
    476 U.S. 355 (1986) ......................................................................................... 20

*Larson v. Domestic & Foreign Com. Corp.*
    337 U.S. 682 (1949) ............................................................................... 19, 20, 21

*Leedom v. Kyne*
    358 U.S. 184 (1958) .......................................................................... x, 19, 20, 21

*Maine v. Taylor*
    477 U.S. 131 (1986) ...................................................................................... viii, 5

*Maine v. U.S. Dep't of Agric.*
    778 F. Supp. 3d 200 (D. Me. 2025) ................................................................ 11

*Maya v. Centex Corp.*
    658 F.3d 1060 (9th Cir. 2011) ........................................................................... 4

*MedImmune, Inc. v. Genentech, Inc.*
    549 U.S. 118 (2007) ........................................................................................... 8

*Montana Air Chapter No. 29, Ass'n of Civ. Technicians, Inc. v. Fed. Lab. Rels.*
    *Auth.*
    898 F.2d 753 (9th Cir. 1990) ..................................................................... x, 18

*Murphy Co. v. Biden*
    65 F.4th 1122 (9th Cir. 2023) ................................................... x, 19, 20, 21

*Nat'l Wildlife Fed'n v. U.S. E.P.A.*
    980 F.2d 765 (D.C. Cir. 1992) ...................................................................... 18

*NIH v. Am. Pub. Health Assoc.*
    145 S. Ct. 2658 (2025) (per curiam) ............................................................ 12

*Nuclear Regulatory Comm'n v. Texas*
    145 S. Ct. 1762 (2025) .............................................................................. 19, 20

*Nyunt v. Chairman, Broadcasting Bd. of Govs.*
    589 F.3d 445 (D.C. Cir. 2009) ...................................................................... 20

*Oregon Nat. Desert Ass'n v. U.S. Forest Serv.*
    465 F.3d 977 (9th Cir. 2006) ......................................................................... 16

*Planned Parenthood Great Nw. v. Labrador*
    122 F.4th 825 (9th Cir. 2024) ................................................................. ix, 14

### TABLE OF AUTHORITIES
**(continued)**

**Page**

*Reno v. Catholic Social Services*
    509 U.S. 43 (1993) ................................................................................................ 14

*Retail Prop. Trust v. United Broth. of Carpenters & Joiners of Am.*
    768 F.3d 938 (9th Cir. 2014) ............................................................................ 4, 10

*Rhea Lana, Inc. v. Dep't of Lab.*
    824 F.3d 1023 (D.C. Cir. 2016) ........................................................................... 17

*Roe v. Critchfield*
    137 F.4th 912 (9th Cir. 2025) ............................................................................... 12

*Ry. Clerks v. Ass'n for Benefit of Non-contract Empl.*
    380 U.S. 650 (1965) ............................................................................................. 20

*Sackett v. EPA*
    566 U.S. 120 (2012) ................................................................................... x, 16, 17

*San Diego Cnty. Gun Rts. Comm. v. Reno*
    98 F.3d 1121 (9th Cir. 1996) ............................................................................... 14

*San Francisco Herring Ass'n v. Dep't of the Interior*
    946 F.3d 564 (9th Cir. 2019) ............................................................................... 16

*Sato v. Orange Cnty. Dep't of Educ.*
    861 F.3d 923 (9th Cir. 2017) ................................................................................. 7

*Sierra Club v. Trump*
    963 F.3d 874 (9th Cir. 2020) ............................................................................... 20

*Solar Turbines Inc. v. Seif*
    879 F.2d 1073 (3rd Cir. 1989) ............................................................................ 17

*Spokane Indian Tribe v. U.S.*
    972 F.2d 1090 (9th Cir.1992) ............................................................................. 12

*Spokeo, Inc. v. Robins*
    578 U.S. 330 (2016) ............................................................................................ 4, 8

*Stoner v. Santa Clara Cnty. Off. of Educ.*
    502 F.3d 1116 (9th Cir. 2007) ..................................................................... ix, 7, 8

*Thakur v. Trump*
    No. 3:25-cv-04737-RFL, 2025 WL 2696424 (N.D. Cal. Sept. 22, 2025) ............................. 11

## TABLE OF AUTHORITIES
### (continued)

**Page**

*Thomas v. Anchorage Equal Rts. Comm'n*
  220 F.3d 1134 (9th Cir. 2000)................................................................. ix, 9, 11, 14

*Twitter, Inc. v. Paxton*
  56 F.4th 1170 (9th Cir. 2022).................................................................... 13

*U.S. Army Corps of Eng'rs v. Hawkes Co.*
  578 U.S. 590 (2016).................................................................................. 17

*Ukiah Valley Med. Ctr. v. FTC*
  911 F.2d 261 (9th Cir. 1990).................................................................... 16

*Washington v. FDA*
  108 F.4th 1163 (9th Cir. 2024)................................................................. 5, 6

*Whitman v. Am. Trucking Ass'ns*
  531 U.S. 457 (2001).................................................................................. 15

*Youngstown Sheet & Tube Co. v. Sawyer*
  343 U.S. 579 (1952)................................................................................. 20, 21

STATUTES

5 U.S.C.
  § 701(a) ..................................................................................................... 18
  § 701(a)(2) ................................................................................................ 15, 18
  § 704 .......................................................................................................... 15

28 U.S.C.
  § 2201(a) ................................................................................................... 12

Administrative Procedure Act.................................................................... *passim*

Cal. Educ. Code
  § 221.5(f) ................................................................................................... *passim*
  § 33353 ...................................................................................................... 1

Civil Service Reform Act........................................................................... 20

Declaratory Judgment Act.......................................................................... 13

False Claim Act........................................................................................... 7

Financial Institutions Supervisory Act...................................................... 20

Indian Child Welfare Act........................................................................... 6

1

## TABLE OF AUTHORITIES
### (continued)

2

**Page**

3

National Labor Relations Act ........................................................................................... 20

4

Railway Labor Act ............................................................................................................ 20

5

State Antidiscrimination Law .......................................................................................... 5

6

Title IX ........................................................................................................................ *passim*

7

**CONSTITUTIONAL PROVISIONS**

8

Eleventh Amendment ........................................................................................................ 7

9

Article III ................................................................................................................. 4, 8, 14

10

Equal Protection Clause .............................................................................................. *passim*

11

**COURT RULES**

12

Federal Rules of Civil Procedure

13

    Rule 12(b)(1) ............................................................................................................ 4

14

    Rule 12(b)(1) and (6) ............................................................................................. viii
    Rule 12(b)(6) ............................................................................................................ 4

15

**OTHER AUTHORITIES**

16

Assemb. Bill No. 1266 (2013-2014 Reg. Sess.) ............................................................. 1

17

18

CBS News, "Trump administration says it's cutting $175 million in funding to
    University of Pennsylvania," Mar. 20, 2025 ........................................................... 11

19

Exec. Order No. 14,168, 90 Fed. Reg. 8615 (Jan. 30, 2025) ......................................... 2

20

Exec. Order No. 14,201, 90 Fed. Reg. 9279 (Feb. 11, 2025) .................................. 2, 11

21

22

23

24

25

26

27

28

**SUMMARY OF ARGUMENT AND STATEMENT OF ISSUES**

For over a decade, Section 221.5(f) of the California Education Code has required schools to allow transgender student athletes to participate in school-sponsored sports in accordance with their gender identity. The California Interscholastic Federation ("CIF") implements this law in high school sports competition through its Bylaw 300.D. These statewide policies are now in the crosshairs of the Trump Administration, which has commenced a sustained campaign to exclude transgender youth, particularly transgender girls, from school activities and athletics across the country. This campaign has taken the form of executive orders, lawless funding terminations, and Title IX investigations of state and local entities that allow transgender students to participate in school sports—including the California Department of Education and CIF. Now, the Administration has opened a new front in its campaign against transgender student athletes.

On June 2, 2025, following the President's social media posts about state track finals and threatening withdrawal of funding to the state, the U.S. Department of Justice sent a letter to all local education agencies ("LEAs") in California asserting that CIF Bylaw 300.D facially violates the Equal Protection Clause, and *requiring* LEAs to certify within 7 days that they "will not implement" the bylaw—or face "legal liability." The State of California filed this action seeking declaratory and injunctive relief to prevent Defendants from enforcing this latest threat.

Defendants now seek to dismiss the Complaint under Rule 12(b)(1) and (6), arguing that Plaintiff lacks standing, that the claims are not ripe, and that the APA and *ultra vires* claims are not reviewable. The motion should be denied.

**I. Plaintiff has standing**. First, the Certification Demand Letter threatens to injure Plaintiff's sovereign and proprietary interests. Plaintiff has a sovereign interest in enforcing its own legal code and has standing to defend the constitutionality of its statutes, and Bylaw 300.D is functionally identical to Section 221.5(f) and ensures an LEA's compliance with state law. *Maine v. Taylor*, 477 U.S. 131, 137 (1986). Under California law, LEAs are arms of the state. Plaintiff has a sovereign interest in providing an equal public education system, and a proprietary interest as the party that supervises that system and that is ultimately responsible for any financial impact on LEAs. *Butt v. California*, 4 Cal. 4th 668, 680 (1992); *Belanger v. Madera Unified Sch. Dist.*,

1    963 F.2d 248, 254 (9th Cir. 1992); *Stoner v. Santa Clara Cnty. Off. of Educ.*, 502 F.3d 1116,

2    1121-23 (9th Cir. 2007). An allegation of an ambiguous funding condition is a cognizable injury

3    for state standing. *Arizona v. Yellen*, 34 F.4th 841, 852 (9th Cir. 2022).

4         Pre-enforcement relief is appropriate because, contrary to Defendants' attempt to recast the

5    Certification Demand Letter as "advisory," the letter explicitly threatens "legal liability" if LEAs

6    do not "certify" that they will disobey state law. The letter was directly precipitated by funding

7    threats from the President, and the Administration has prioritized anti-transgender enforcement,

8    including against Bylaw 300.D. *Thomas v. Anchorage Equal Rts. Comm'n*, 220 F.3d 1134, 1139

9    (9th Cir. 2000) (en banc); *Cal. Trucking Ass'n v. Bonta*, 966 F.3d 644, 652 (9th Cir. 2021).

10        Plaintiff is not asserting third-party equal protection rights—instead, Plaintiff is *defending*

11   against the Administration's assertion of such rights against Plaintiff. Defendants' own

12   threatening actions make declaratory relief appropriate. *Hal Roach Studios, Inc. v. Richard Feiner*

13   *& Co.*, 896 F.2d 1542, 1556 (9th Cir.1990).

14        **II. Plaintiff's claims are ripe.** The constitutional element of ripeness is satisfied when, as

15   shown here, Plaintiff's pre-enforcement injury gives rise to standing. *Thomas*, 220 F.3d at 1139.

16   The Complaint also satisfies prudential ripeness. Whether Defendants have authority to make the

17   certification demand or impose a funding condition without clear notice is a "purely legal"

18   question. Contrary to Defendants' vague allusion to a future administrative process, Defendants

19   have already concluded unequivocally that Bylaw 300.D is a *facial* violation of the constitution—

20   thus conceding a "concrete factual situation" sufficiently fit for judicial review. *Bishop Paiute*

21   *Tribe v. Inyo Cnty.*, 863 F.3d 1144, 1153 (9th Cir. 2017). Dismissal for ripeness would cause a

22   hardship on Plaintiff, because the Certification Demand Letter "requires an immediate and

23   significant change in the plaintiffs' conduct of their affairs with serious penalties attached to

24   noncompliance." *Planned Parenthood Great Nw. v. Labrador*, 122 F.4th 825, 840 (9th Cir.

25   2024).

26        **III. Plaintiff's APA claims are reviewable.** The Certification Demand Letter is a final

27   agency action because, as Defendants do not dispute, it "consummates" their decisionmaking;

28   because it determines Plaintiff's "rights or obligations" by not only applying its new legal

1    position to Bylaw 300.D and California Education Code but also requiring immediate

2    compliance; and because "legal consequences" flow from the letter in the form of threatened

3    "legal liability" (including "large scale fines") if LEAs do not make the required certification.

4    *Bennett v. Spear*, 520 U.S. 154, 177–78 (1997); *Sackett v. EPA*, 566 U.S. 120, 126 (2012).

5          Plaintiff does not challenge any future decision not to enforce the law, but rather alleges

6    that the Certification Demand Letter is in violation of the APA, and so these claims are not barred

7    as "committed to agency discretion." *Montana Air Chapter No. 29, Ass'n of Civ. Technicians,*

8    *Inc. v. Fed. Lab. Rels. Auth.*, 898 F.2d 753, 758 (9th Cir. 1990).

9          **IV. Plaintiff has an equitable cause of action**. Binding precedent forecloses Defendants'

10    argument that the court cannot hear Plaintiff's claim that the Certification Demand Letter is *ultra*

11    *vires*. *Murphy Co. v. Biden*, 65 F.4th 1122, 1129 (9th Cir. 2023). The *Leedom v. Kyne*

12    "exception" does not apply because Congress has not limited judicial review to begin with.

13          Notably, while Defendants seek to curtail Plaintiff's claims based on justiciability,

14    Defendants do not challenge the substance of the underlying claims, which are primarily legal.

15    Defendants do not claim to have any statutory or constitutional authority for issuing the

16    Certification Demand Letter, they do not point to any statute that would give clear notice

17    conditioning funding on the Equal Protection Clause, and they do not provide any authority to

18    support their harmful new interpretation of the Equal Protection Clause.

19          For the above reasons, the Court should hear Plaintiff's claims and reject Defendants'

20    attempt to close the courthouse door.

21

22

23

24

25

26

27

28

1

**FACTUAL BACKGROUND**

2

**A.    Statutory and Regulatory History**

3       In 2013, the California State Legislature enacted Assembly Bill 1266, codified at section

4   221.5(f) of the California Education Code, which states: "A pupil shall be permitted to participate

5   in sex-segregated school programs and activities, including athletic teams and competitions, and

6   use facilities consistent with his or her gender identity, irrespective of the gender listed on the

7   pupil's records." Complaint (Corrected), Dkt. 4 ("Compl.") ¶ 56; Cal. Educ. Code § 221.5(f)

8   ("Section 221.5(f)").

9       Following the passage of AB 1266, the California Interscholastic Federation ("CIF")

10   adopted its Bylaw 300.D, which, like Section 221.5(f), requires that "[a]ll students should have

11   the opportunity to participate in CIF activities in a manner that is consistent with their gender

12   identity, irrespective of the gender listed on a student's records." Compl. ¶ 59. CIF is a voluntary

13   statewide organization authorized by the California State Legislature to govern interscholastic

14   athletics competitions in accordance with state law. *Id.*; Cal. Educ. Code § 33353.

15       Since that time, cisgender students and a small number of transgender students have played

16   on teams together and competed against one another across the State. Compl. ¶ 58. And for a

17   much longer time, California schools have had a variety of co-ed athletic programs at all age

18   levels. *Id.*

19

**B.    Trump and His Administration Target Transgender Student Athletes**

20       During his 2024 presidential campaign, Donald Trump has targeted transgender people, and

21   transgender youth in particular, with contempt and animosity. The Trump campaign reportedly

22   dedicated nearly a third of its television advertising spending to anti-trans and anti-LGBTQ

23   television advertisements. Compl. ¶¶ 65-66. He promised to drive out "transgender insanity" from

24   schools and called transgender student athletes "sick" and "deranged." *Id.* ¶ 66-67.

25       The Trump Administration has sought to translate these statements into a national policy

26   through a series of executive orders and agency actions. On his first day in office, the President

27   issued an executive order declaring that transgender identity is "false" and ordering his

28   administration to enforce this view, including by "end[ing] the Federal funding of gender

1

ideology." Compl. ¶ 69; *see also* Exec. Order No. 14,168, 90 Fed. Reg. 8615 (Jan. 30, 2025). On February 5, 2025, he issued another executive order seeking to prohibit transgender girls and women from participating in school-sponsored sports teams in accordance with their gender identity. Compl. ¶ 71; Exec. Order No. 14,201, 90 Fed. Reg. 9279, 9279 (Feb. 11, 2025). That order directed all federal agencies to "review grants to educational programs and, where appropriate, rescind funding to programs that fail to comply with the policy established in this order." Compl. ¶ 72.

### C. Trump Administration Response to a California Student Participating in a High School Track Event

In a social media post on May 27, 2025, President Trump posted on Truth Social about a sixteen-year-old transgender girl who participated in a high school track meet in California, and criticized Plaintiff for "continu[ing] to allow 'MEN TO PLAY IN WOMEN'S SPORTS.'" Compl. ¶ 74; Request for Judicial Notice ("RJN"), Exh. A. The President complained that the student was "now qualified to compete in the 'State Finals' next weekend," and warned: "Please be hereby advised that large scale Federal Funding will be held back, maybe permanently, if the Executive Order on this subject matter is not adhered to." RJN, Exh. A. The President stated he would speak to "[t]he Governor . . . to find out which way he wants to go??? In the meantime I am ordering local authorities, if necessary, to not allow the transitioned person to compete in the State Finals." *Id.*

On June 2, 2025, President Trump issued a second social media post referring to the same transgender girl, who he called "[a] Biological Male." Compl. ¶ 75; RJN, Exh. B. Because the student competed in the "State Finals . . . despite the fact that they were warned by me not to do so," the President threatened financial penalties against Plaintiff: "As Governor Gavin Newscum [sic] fully understands, large scale fines will be imposed!!!" RJN, Exh. B.

That same day, Defendants made good on President Trump's enforcement threats by issuing a letter to all local educational agencies ("LEAs") in California. asserting that CIF Bylaw 300.D is "facially unconstitutional" because permitting transgender girls to compete in girls' sports "would deprive [cisgender] girls of athletic opportunities and benefits based solely on their

biological sex, in violation of the Equal Protection Clause." Compl. ¶¶ 82-83 & Exh. A

("Certification Demand Letter"). The letter closed with a specific demand:

> **To ensure compliance and avoid legal liability, you must certify in writing by**
> **5:00 p.m. ET on June 9, 2025, that you will not implement CIF Bylaw 300.D**.
> Certifications may be sent by electronic mail to Jesus.Osete@usdoj.gov and
> CRT.schoolcertifications@usdoj.gov or mailed to 950 Pennsylvania Avenue, N.W.,
> Washington, DC 20530-0001.

*Id.* (emphasis in original).

### D.    Plaintiff's Response to the Certification Demand Letter

On June 3, 2025, the California Department of Education ("CDE") sent a letter addressed to

its LEAs explaining that "[t]he DOJ assertions are not in themselves law" and informing them

that "CDE plans to respond to the DOJ on behalf of the state and its LEAs by the requested date."

Compl. ¶ 85. On June 9, 2025, CDE sent a letter to Defendant U.S. DOJ on behalf of California

LEAs, declining to certify. *Id.* ¶ 86.

The same day, Plaintiff filed this lawsuit. *See* Dkt. 1. The Complaint seeks declaratory and

injunctive relief against the Certification Demand Letter in five counts: (I) that Bylaw 300.D does

not facially violate the Equal Protection Clause as Defendants claim; (II) that Defendants have no

authority to demand such a certification; (III) to the extent that Defendants seek to condition

funding on this interpretation, Plaintiff lacked clear notice; (IV) to the extent that Defendants seek

to condition funding, it would unconstitutionally require Plaintiff to violate students' rights; and

(V) the letter violates the Administrative Procedure Act. Defendants filed this motion to dismiss

on August 22, 2025. Dkt. 16.

### E.    Defendants' Title IX Lawsuit Challenging Section 221.5(f) and Bylaw 300.D

Separate from Defendants' attempt to employ the Equal Protection Clause to override

Section 221.5(f) and Bylaw 300.D, Defendants are also attempting to employ Title IX for the

same unlawful end. On July 9, 2025, Defendants filed an action in the Central District of

California against both CDE and CIF seeking to enforce the Administration's interpretation of

Title IX as it relates to transgender students in sports, under the caption *United States of America*

3

1     *v. California Interscholastic Federation and California Department of Education.* RJN, Exh. C;

2     *see also* Mot. at 13 n. 4.

3                                                 **LEGAL STANDARD**

4          A party may move to dismiss a complaint for "lack of subject matter jurisdiction,"

5     including for a lack of Article III standing, under Federal Rule of Civil Procedure 12(b)(1). *Maya*

6     *v. Centex Corp.*, 658 F.3d 1060, 1067 (9th Cir. 2011). On a motion to dismiss under Rule

7     12(b)(1), the court "must accept as true all material allegations of the complaint and must

8     construe the complaint in favor of the complaining party." *Id.* at 1068. (internal quotation marks

9     and citation omitted). Standing "in no way depends on the merits of the [ ] contention that

10    particular conduct is illegal." *Id.* (quoting *Warth v. Seldin*, 422 U.S. 490, 500 (1975)).

11         A motion to dismiss under Rule 12(b)(6) "tests the legal sufficiency of the claims asserted

12    in a complaint." *Ileto v. Glock, Inc.*, 349 F.3d 1191, 1199-1200 (9th Cir. 2003). The Court "must

13    accept as true all factual allegations in the complaint and draw all reasonable inferences in favor

14    of the nonmoving party." *Retail Prop. Trust v. United Broth. of Carpenters & Joiners of Am.*, 768

15    F.3d 938, 945 (9th Cir. 2014). To survive the motion, "a complaint must allege 'enough facts to

16    state a claim to relief that is plausible on its face.'" *Id.* (quoting *Bell Atlantic Corp. v. Twombly*,

17    550 U.S. 544, 555, 570 (2007)).

18                                                  **ARGUMENT**

19    **I.**     **PLAINTIFF HAS STANDING**

20         The core requirements for Article III standing are injury, causation, and redressability.

21    *Food & Drug Admin. v. All. for Hippocratic Med.*, 602 U.S. 367, 380 (2024). "To establish an

22    injury in fact, a plaintiff must show that he or she suffered 'an invasion of a legally protected

23    interest' that is 'concrete and particularized.'" *Spokeo, Inc. v. Robins*, 578 U.S. 330, 339-340

24    (2016). The injury must also be "actual or imminent, not speculative—meaning that the injury

25    must have already occurred or be likely to occur soon." *All. for Hippocratic Med.*, 602 U.S. at

26    381. A plaintiff alleging "future injury" must show that "the threatened injury is certainly

27    impending, or there is a substantial risk that the harm will occur." *Dep't of Commerce v. New*

28    *York*, 588 U.S. 752, 767 (2019) (citation omitted).

4

While Defendants' motion questions Plaintiff's standing for each count, the arguments are largely repetitive, and are predicated on three overarching assumptions: (A) that Plaintiff has no cognizable interest in whether its LEAs comply with state antidiscrimination law or face "legal liability," *see, e.g.*, Mot. at 14; (B) that the Certification Demand Letter is purely advisory, and makes no threat, *see, e.g.*, *id.* at 15; and (C) that Plaintiff is seeking to assert the "equal protection rights of its residents in *parens patriae*," *id.* at 7. The first assumption is incorrect as a matter of law, the second is patently false based on the text of the letter and the unprecedented context of the message, and the third misconstrues the Complaint as asserting, rather than defending against, an equal protection challenge. Accordingly, Defendants' arguments on each count fail.[1]

### A. The Certification Demand Letter Threatens California's Legally Protected Interests

#### 1. Defendants' Attempt to Override State Antidiscrimination Law Injures Plaintiff's Sovereign Interest in Creating and Enforcing a Legal Code

Plaintiff has standing based on its sovereign interest in upholding Section 221.5(f) against Defendants' attempt to "nullify California law." Compl. ¶ 89; *see Washington v. FDA*, 108 F.4th 1163, 1176 (9th Cir. 2024) (state's "sovereign interest" in "creat[ing] and "enforc[ing] a legal code" is "sufficient to convey standing to defend a state statute against a legal challenge in federal court, or to challenge a federal statute that preempts or nullifies state law"); *Maine v. Taylor*, 477 U.S. 131, 137 (1986) (determining Maine had standing to defend constitutionality of state statute because "a State clearly has a legitimate interest in the continued enforceability of its own statutes"); *Diamond v. Charles*, 476 U.S. 54, 62 (1986) (stating that "a State has standing to defend the constitutionality of its statute").

Although the Certification Demand Letter names CIF Bylaw 300.D instead of Section 221.5(f), that is a distinction without a difference. Bylaw 300.D simply "reflects" Section 221.5(f)

---

[1] Defendants do not challenge causation or redressability, except for a passing reference predicated solely on the supposed lack of injury. Mot. at 14. Nevertheless, these prongs are plainly satisfied for this and all counts: The threat to Plaintiff's sovereign and proprietary interests, *see* Part I.A, *supra*, is caused by this *ultra vires* demand that LEAs refuse to comply with state law and concomitant threat of "legal liability" and "large scale" financial consequences if they do not. The declaratory and injunctive relief sought would defang the Certification Demand Letter and remove the threat.

5

1    with essentially identical text. Compl. ¶ 62. Both provisions provide that students should have the

2    opportunity "to participate in… activities… *consistent with their gender identity, irrespective of*

3    *the gender listed on a student's records*." *Compare* Compl. ¶ 59 (emphasis added). Thus,

4    Defendants' demand that LEAs "not implement CIF Bylaw 300.D," Compl., Exh. A, is

5    tantamount to ordering LEAs to disobey Section 221.5(f).

6        Defendants rely on the fact the CIF Bylaw 300.D reflects state law in Defendants'

7    affirmative lawsuit against Plaintiff's Department of Education over these same provisions. *See*

8    RJN, Exh. C, at 8-9 ("CDE's Control Over CIF and High School Sports"); *see also id.* ¶¶ 50-51

9    (showing CDE directing CIF to "continue to comply" with Section 221.5(f) in the face of Trump

10   Administration policy).

11       While Defendants cite *Washington*, 108 F.4th at 1176, and *Haaland v. Brakeen*, 599 U.S.

12   255 (2023) to argue Plaintiff cannot establish a sovereign injury in this case, *see* Mot. at 10-11,

13   those cases are inapposite because neither case involved an actual conflict between state law and

14   federal action. In *Washington*—which affirmed a state has standing based on its "sovereign

15   interest" in "creat[ing] and "enforc[ing] a legal code," 108 F.4th at 1176—Idaho did not allege

16   that approving mifepristone for mail dispensing would nullify the state's ban on the medication.

17   *Id.* at 1176-77. Instead, Idaho only alleged a "logistical burden" on the state in enforcing its ban.

18   *Id.* The court determined that a state's "cognizable interest in the preservation of sovereign

19   authority . . . does not convey standing to challenge federal action that affects state law

20   enforcement indirectly, by making violations of state law more difficult or costly to detect." *Id.*

21   The Certification Demand Letter, in contrast, presents an irreconcilable conflict with Section

22   221.5(f) of the California Educational Code, which requires LEAs to allow transgender girls to

23   participate in sports teams in accordance with their gender identity.

24       Similarly, in *Haaland*, Texas had not enacted a law in conflict with the Indian Child

25   Welfare Act. Instead, the state argued only that its role in child-custody proceedings gave it

26   standing to assert third-party rights under the Equal Protection Clause. *Id.* at 295. In this case,

27   Plaintiff is not asserting the rights of third parties but rather "defend[ing] a state statute against a

28   legal challenge" by Defendants. *FDA*, 108 F.4th at 1176; *see* Part I.C, *infra*.

### 2. In California, LEAs Are Arms of the State, and So Threats to LEAs Are Threats to the State

Defendants make much of the fact that the Certification Demand Letter was addressed to LEAs, and not to the state. *E.g.* Mot. at 1, 10; *but cf.* Compl. ¶ 75 (threat directed to "Governor Gavin Newscum"). However, under California law, a threat to the operation or finances of LEAs is a threat to the State's sovereign and proprietary interests.

"Since its admission to the Union, California has assumed specific responsibility for a statewide public education system open on equal terms to all." *Butt v. California*, 4 Cal. 4th 668, 680 (1992). Under California law, "[t]he system of public schools, although administered through local districts 'created by the Legislature, is *one* system . . . applicable to all the common schools . . .'" *Id.* at 681 (quoting *Kennedy v. Miller* 97 Cal. 429, 432 (1893)). "Management and control of the public schools is a matter of state, not local, care and supervision." *Id.* (cleaned up). "[T]he State's ultimate responsibility for public education cannot be delegated to any other entity." *Id.* (citations omitted).

Thus, Defendants' demand that LEAs disregard state law is not only an injury to Plaintiff's sovereign interest in enforcing its own legal code generally, *see* Part I.A, *supra*, it is also an injury to Plaintiff's sovereign interest in providing equal public education in particular, as well as to its proprietary interest as the party tasked with "supervision" of the "one" school system in the state. *Id.*; *see also Bowen v. Pub. Agencies Opposed to Soc. Sec.*, 477 U.S. 41, 50 & n. 17 (1986) (state has "judicially cognizable interest in the preservation of its own sovereignty" where it alleges federal law "impair[s] the State's ability . . . to structure its relationships with its employees") (quotation marks omitted).

Accordingly, the Ninth Circuit has consistently recognized that an LEA in California must be "treated as an arm of the State" and a "political subdivision." *Sato v. Orange Cnty. Dep't of Educ.*, 861 F.3d 923, 928-29 (9th Cir. 2017). Like other political subdivisions, LEAs enjoy Eleventh Amendment sovereign immunity. *Belanger v. Madera Unified Sch. Dist.*, 963 F.2d 248, 254 (9th Cir. 1992). Similarly, LEAs, as "state agencies," are not subject to liability in *qui tam* suits under the False Claim Act. *Stoner v. Santa Clara Cnty Off. of Educ.*, 502 F.3d 1116, 1121-

7

23 (9th Cir. 2007). Indeed, in their Title IX enforcement action against CDE, Defendants recognized this relationship, relying on Plaintiff's oversight over public schools as the basis for seeking to hold the California Department of Education liable under Title IX for the same athletic policies being implemented by LEAs here. RJN, Exh. C ¶¶ 16, 41-42 (alleging state authority over LEA athletic policies); *id.* ¶ 49 (state directive to LEAs on Section 221.5(f)); *id.* ¶¶ 89, 96-97 (alleging state responsible for violations at LEAs).

Defendants' threats of "legal liability" to LEAs, Compl. ¶ 84—including the withdrawal of "large scale Federal Funding" and "large scale fines," *id.* ¶¶ 74-75—is also a threat of injury to the state budget. In California's public education system, state and local funds are "interchangeable" and "a judgment against the school district would be satisfied from state funds," *Belanger*, 963 F.2d at 252; *see also Stoner*, 502 F.3d at 1123 (California is "unconditionally liable to make up any budgetary shortfall encountered by [LEAs] as a result of an adverse judgment"). It is axiomatic that an anticipated "loss of federal funds" can establish an injury for purposes of Article III standing. *Dep't of Commerce*, 588 U.S. at 266*; see also Biden v. Nebraska*, 600 U.S. 477, 490 (2023) (state standing where a state-chartered independent corporation would collect fewer servicing fees due to student loan forgiveness program).

## B.   The Complaint Establishes a Pre-Enforcement Injury

Both the text and the context of the Certification Demand Letter show the direct threat to the interests discussed in Part I.A, *supra*, and thus Plaintiff has alleged a pre-enforcement injury that is "actual or imminent, not conjectural or hypothetical." *Spokeo*, 578 U.S. at 339. Plaintiff "need only establish a risk or threat of injury to satisfy the actual injury requirement." *E. Bay Sanctuary Covenant v. Trump*, 932 F.3d 742, 763–64 (9th Cir. 2018) (internal quotation marks and citations omitted). Generally, "where threatened action by government is concerned, [courts] do not require a plaintiff to expose himself to liability before bringing suit to challenge the basis for the threat." *MedImmune, Inc. v. Genentech, Inc.*, 549 U.S. 118, 128-29 (2007). Contrary to Defendants' argument, harm need not be "literally certain" for a plaintiff to assert standing. *Clapper v. Amnesty Int'l USA*, 568 U.S. 398, 414 n.5 (2013). Instead, the Supreme Court has unanimously held that injury-in-fact may be established by "a substantial risk that the

8

harm will occur." *Dep't of Commerce*, 588 U.S. at 767 (citation omitted).

Courts in the Ninth Circuit examine three factors to determine "the genuineness of a claimed threat of prosecution": "[1] whether the plaintiffs have articulated a 'concrete plan' to violate the law in question, [2] whether the prosecuting authorities have communicated a specific warning or threat to initiate proceedings, and [3] the history of past prosecution or enforcement under the challenged statute." *Cal. Trucking Ass'n v. Bonta*, 966 F.3d 644, 652 (9th Cir. 2021) (quoting *Thomas v. Anchorage Equal Rts. Comm'n*, 220 F.3d 1134, 1139 (9th Cir. 2000) (en banc)). Each of these factors weigh in favor of standing.

### 1. Defendants Concede Plaintiff Is Currently "In Violation" of Their Interpretation of the Equal Protection Clause

Here, Plaintiff has more than a "concrete plan" to "violate" Defendants' directive—as the Certification Demand Letter itself asserts, California LEAs are currently "in violation" of Defendants' interpretation of the Equal Protection Clause due to Bylaw 300.D (and, ultimately, due to Section 221.5(f)). Compl., Exh. A; *see also* Compl. ¶¶ 56-58 (discussing how K-12 students have participated on teams in accordance with their gender identity since 2013); *id.* ¶¶ 74-75 (President threatening Plaintiff for one such instance). Thus, the first *Thomas* factor weighs in favor of standing.

### 2. On Its Face, the Letter Is a "Specific Warning or Threat," Not Merely "Advisory"

The Certification Demand Letter's repeated references to Bylaw 300.D's unconstitutionality and language conveying legal obligations and consequences constitute "a specific warning or threat to initiate proceedings." *Thomas*, 220 F.3d at 1139. Defendants' characterization of the letter as "advisory" is belied by the actual text. After asserting that Bylaw 300.D is facially unconstitutional, the letter states in bolded and underlined text that to "**avoid legal liability, you must certify in writing by 5:00 p.m. on June 9, 2025 that you will not implement CIF Bylaw 300.D.**" Compl., Ex. A (emphasis in original). The directive "must" is mandatory: compliance with the letter's demand to certify is the only action that serves "to avoid" the threatened "legal liability." Nor is the certification "*whether* [LEAs] *would* comply with the CIF bylaw," as Defendants wishfully assert. *See* Mot. at 20 (emphasis added). The letter plainly

9

1    requires LEAs to certify "that [they] will not." Thus, the Certification Demand Letter

2    demonstrates, on its face, the kind of "credible threat of enforcement" required to assert a pre-

3    enforcement challenge to a government action. *See Cal. Trucking*, 996 F.3d at 653 (determining

4    that sending letters to businesses "notifying them" of the government's interpretation of a new

5    legal requirement demonstrated sufficient intent to enforce a law).

6         The President's contemporaneous social media posts also evince a "specific warning or

7    threat" of financial consequences in no uncertain terms. On May 27, 2025, the President

8    responded to the participation of a transgender athlete in California by writing: "Please be hereby

9    advised that large scale Federal Funding will be held back, maybe permanently, if the Executive

10   Order on this subject matter is not adhered to." RJN, Exh. A; *see also id.* ("I am ordering local

11   authorities, if necessary, to not allow the transitioned person to compete in the State Finals.") On

12   June 2, 2025, he referred to his previous post as a "warn[ing]" that had been ignored, and

13   promised "large scale fines will be imposed" against Plaintiff. RJN, Exh. B. Defendants sent the

14   Certification Demand Letter to "local authorities" that same day—and, on a motion to dismiss,

15   the Court should draw the "reasonable inference[]" that the social media threats are connected.

16   *Retail Prop. Trust*, 768 F.3d at 945; *see also In re Gilead Scis. Secs. Litig.*, 536 F.3d 1049, 1055

17   (9th Cir. 2008) (claim is plausible when it "allows the court to draw the reasonable inference that

18   the defendant is liable for the misconduct alleged"). The Ninth Circuit has made clear that "loss

19   of funds promised under federal law satisfies Article III's standing requirement," and, here, the

20   "possibility of non-enforcement does not mean that" California "lacks standing." *City & Cnty. of*

21   *San Francisco v. Trump*, 897 F.3d 1225, 1235-36 (9th Cir. 2018); *see also Arizona v. Yellen*, 34

22   F.4th 841, 852 (9th Cir. 2022) (ambiguous funding condition is a "cognizable injury" to state's

23   sovereign interests).

24        While Defendants now posit that the Certification Demand Letter is "not binding," that

25   litigation position will not constrain Defendants' actions if the action is dismissed. Even now,

26   Defendants have not disavowed their stated intent to enforce the erroneous interpretation of the

27   Equal Protection Clause announced in the Certification Demand Letter—instead reserving their

28   "discretionary authority" to do so. Mot. at 13. The "state's refusal to disavow enforcement ... is

10

1    strong evidence that the state intends to enforce the law and that [the plaintiffs] face a credible

2    threat." *Cal. Trucking*, 996 F.3d at 653. Whether the letter is, ultimately, binding is a merits

3    question that the Court should not decide in this motion. *Yellen*, 34 F.4th at 849 (stating that

4    "standing 'in no way depends on the merits'"). Instead, the Court should look to the allegations in

5    the Complaint, and here, the text and context of the Certification Demand Letter are sufficient to

6    show "a specific warning or threat to initiate proceedings." *Thomas*, 220 F.3d at 1139.

> ### 3. The Trump Administration Has Prioritized "Prosecution and Enforcement" Against the Participation of Transgender Girls in School-Sponsored Sports

9    Because Defendants' novel interpretation of the Equal Protection Clause and certification

10   demand are "relatively new and the record contains little information as to enforcement," the third

11   *Thomas* factor need have "little weight" here. *Cal. Trucking*, 996 F.3d at 653 (citation omitted).

12   Nevertheless, the Court can look to the Administration's "history of past enforcement" against

13   "similarly situated" parties using different legal tools. *Id.* at 654. Here, the President issued an

14   executive order that purports to prohibit transgender girls from participating on teams in

15   accordance with their gender identity and directs executive agencies to prioritize enforcement of

16   this ban and rescind funding, through Title IX or otherwise. Compl. ¶ 71; Exec. Order 14201, 90

17   Fed. Reg. 9279-80. Apart from a multitude of Title IX investigations opened into transgender

18   participation in school sports, *see, e.g.,* RJN, Exh. C ¶¶ 98-100, the Administration has also

19   attempted to push this policy outside of the Title IX administrative process. For example, in

20   February and March 2025, the President issued several direct threats regarding transgender

21   participation in sports in Maine. *Maine v. U.S. Dep't of Agric.*, 778 F. Supp. 3d 200, 210 (D. Me.

22   2025). As in this case, the threats were personally directed to the state governor, and included a

23   threat to withhold federal funding. *Id.* On April 2, 2025, USDA froze school nutrition program

24   funds to Maine—without relying on the Title IX administrative process. *Id.* at 210, 231-32.[2]

25   ⎯⎯⎯⎯⎯⎯⎯⎯⎯⎯
[2] The Court can also take notice of this Administration's unprecedented use of political or
26   otherwise arbitrary grant terminations, evinced by dozens of district court injunctions issued this
     year. This includes terminations premised explicitly on transgender sports participation, without
27   following Title IX procedures. *See, e.g., Thakur v. Trump*, No. 3:25-cv-04737-RFL, 2025 WL
     2696424 at *7, 12 (N.D. Cal. Sept. 22, 2025) (NIH summarily withdrawing "hundreds of grants"
28   to UCLA based, *inter alia*, on "allowing men [sic] in women's sports"); CBS News, "Trump
     (continued…)

## C.    Plaintiff Is Not Asserting Third-Party Rights, But Rather Defending State Law

Contrary to Defendants' argument, the Complaint does not assert any type of *parens patriae* or third-party standing. *See* Mot. at 7-9. This argument misses the point entirely: Plaintiff is not "rais[ing] an equal-protection challenge to the DOJ's advisory letter." Mot. at 7. Quite the opposite: Defendants are the parties purporting to assert students' rights under the Equal Protection Clause, and Plaintiff is in the position of *defending* against this facial challenge to its statewide policy. Compl., Exh. A.[3] To be sure, the Complaint discusses Plaintiff's interest in preventing harm to students—because that is a *defense* to the equal protection challenge raised by Defendants. Compl. ¶ 124; *see Roe v. Critchfield*, 137 F.4th 912, 922 (9th Cir. 2025) (stating that sex classification must be "substantially related" to "important governmental objectives"). Defendants have threatened to impose liability if California LEAs do not comply—liability which would be Plaintiff's legal responsibility. *See* Part I.A.2, *supra*.

Defendants have thus created, through their own actions, an "actual controversy" appropriate for resolution by declaratory judgment, and Plaintiff has standing to seek resolution. 28 U.S.C. § 2201(a). Declaratory relief is justiciable here for the same reasons that the injury is imminent: Defendants have made a credible threat of enforcement. *See* Part I.B, *supra*. "If the defendant's actions cause the plaintiff to have a 'real and reasonable apprehension that he will be subject to liability,' the plaintiff has presented a justiciable case or controversy." *Spokane Indian Tribe v. U.S.*, 972 F.2d 1090 (9th Cir.1992). If the plaintiff is presently engaged in "on-going"

---

administration says it's cutting $175 million in funding to University of Pennsylvania," Mar. 20, 2025, https://www.cbsnews.com/philadelphia/news/trump-university-of-pennsylvania-funding-cuts-transgender-athletes-ncaa/ (funding cuts, due to transgender athlete, were "NOT the result of the Title IX investigation"). Recent Supreme Court opinions have made any post-termination remedy highly uncertain. *Compare NIH v. Am. Pub. Health Assoc.*, 145 S. Ct. 2658 (2025) (per curiam) (no district court APA claims "based on" grants) *with id.* at 2672 (Jackson, J., concurring in part) (Court of Federal Claims cannot order "reinstatement of grant funding"). Plaintiff has no choice but to take Defendants' threats seriously.

[3] It is notable that Defendants have pointed to no authority for their novel interpretation of the Equal Protection Clause. In their "Statement of Facts," Defendants cite *Clark v. Arizona Interscholastic Ass'n*, 695 F.2d 1126, 1131 (1982)—but that case *rejected* an equal protection claim, while also stating that separate girls and boys teams are not required by the Constitution. *Id.* ("recogniz[ing]" that defendant could meet its stated purpose of "promoting equality of athletic opportunity between the sexes" in "a number of ways" besides strict sex segregation).

12

1    conduct put at issue, then "the showing of apprehension need not be substantial." *Hal Roach*

2    *Studios, Inc. v. Richard Feiner & Co*., 896 F.2d 1542, 1556 (9th Cir. 1990) (citations and

3    quotation marks omitted). Here, the entire purpose of the unprecedented Certification Demand

4    Letter was to create "a real and reasonable apprehension" that LEAs, and thus Plaintiff, "will be

5    subject to liability": the letter explicitly threatened "legal liability," at the same time the

6    Administration threatened withdrawal of "large scale Federal funds" and "large scale fines." *See*

7    *id.* (apprehension should be determined "with a flexibility that is oriented to the reasonable

8    perceptions of the plaintiff").

9         Defendants' argument that a declaratory judgment claim "usurps" their "discretionary

10   authority" whether to enforce ignores the purpose of the Declaratory Judgment Act, which "is to

11   relieve potential defendants from the Damoclean threat of impending litigation which a harassing

12   adversary might brandish, while initiating suit at his leisure—or never." *Id.* at 1555 (citation and

13   quotation marks omitted). Plaintiff is not seeking to force Defendants to prosecute any matter.

14   Rather, this action is to resolve the question of whether Defendants can impose liability for

15   ongoing conduct, a question that Defendants made immediate and justiciable through their

16   specific actions.[4]

17   **II.    THE CHALLENGE TO THE CERTIFICATION DEMAND LETTER IS RIPE**

18        Whether a pre-enforcement plaintiff's claims are ripe involves consideration of a

19   constitutional and prudential component. *See Bishop Paiute Tribe v. Inyo Cnty.*, 863 F.3d 1144,

20   1153 (9th Cir. 2017). "Constitutional ripeness is often treated under the rubric of standing

21   because ripeness coincides squarely with standing's injury in fact prong." *Id.* at 1153 (internal

22   quotation marks and citation omitted); *see also Twitter, Inc. v. Paxton*, 56 F.4th 1170, 1173 (9th

23   Cir. 2022) ("[T]he constitutional component of ripeness is synonymous with the injury-in-fact

24   prong of the standing inquiry.") (citation omitted). As explained in Section I.B., *supra*, Plaintiff

25

26        [4] Ironically, Defendants point to their Title IX lawsuit against Plaintiff (initially filed in
     the Santa Ana Division of the Central District one month after this action) as somehow showing
27   that their equal protection claim is not a credible threat. To the contrary, the fact that Defendants
     sent the Certification Demand Letter when the Title IX investigation was days from completion,
28   *see* RJN, Exh. C ¶ 100, shows that their equal protection claim was and remains a separate,
     credible threat even while the Title IX process continues.

13

1    has satisfied the Ninth Circuit's three-part test for pre-enforcement challenges, which establishes

2    ripeness under Article III. *Thomas*, 220 F.3d at 1139.

3        Contrary to Defendants' argument, *Reno v. Catholic Social Services*, 509 U.S. 43, 57

4    (1993) does not stand for the proposition that a lawsuit for "injunctive and declaratory relief" can

5    never be ripe. *See* Mot. at 17. In *Reno*, the Court determined that plaintiffs' claims were unripe

6    because the challenged regulations limited access to temporary resident status and the plaintiffs

7    had not yet applied for legalization and felt "the effect[] of the administrative action . . . in a

8    concrete way."  *Reno*, 509 U.S. at 57. Here, by contrast, the Certification Demand Letter

9    announces a legal conclusion, directs compliance, and threatens liability; that alone has

10   "presented plaintiff[] with the immediate dilemma to choose between complying with newly

11   imposed, disadvantageous restrictions and risking serious penalties for violation," which

12   demonstrates ripeness. *Id.* (citing *Abbott Laboratories v. Gardner*, 387 U.S. 136, 152-53 (1967)).

13       Plaintiff also satisfies the "prudential aspects of ripeness," where courts consider "[1] the

14   fitness of the issues for judicial decision and [2] the hardship to the parties of withholding court

15   consideration." *Bishop Paiute Tribe*, 863 F.3d at 1154 (citation omitted). To decide "whether a

16   case is fit for judicial decision," courts examine "whether the case presents a 'concrete factual

17   situation' or purely legal issues." *Id*. Here, whether Defendants have authority to make the

18   certification demand or impose a funding condition without clear notice is a "purely legal"

19   question. Contrary to Defendants' vague allusion to a future administrative process, Defendants

20   have already stated unequivocally that Bylaw 300.D is a facial violation of the constitution—thus

21   conceding a "concrete factual situation" sufficiently fit for judicial review. *Id.* at 1154; *see also*

22   *San Diego Cnty. Gun Rts. Comm. v. Reno*, 98 F.3d 1121, 1132 (9th Cir. 1996) ("With regard to

23   the first [prudential ripeness] inquiry, pure legal questions that require little factual development

24   are more likely to be ripe").

25       Plaintiff meets the hardship prong because the Certification Demand Letter "requires an

26   immediate and significant change in the plaintiff['s] conduct of [its] affairs with serious penalties

27   attached to noncompliance." *Planned Parenthood Great Nw. v. Labrador*, 122 F.4th 825, 840

28   (9th Cir. 2024) (cleaned up). Defendants have threatened "legal liability" if LEAs do not

14

1    renounce Bylaw 300.D, including "large scale" financial consequences. *See* Part I.B, *supra*. If

2    Plaintiff allowed LEAs to ignore Bylaw 300.D, Plaintiff would be abandoning its own state law

3    and its responsibility to provide "equal public education."  *See* Part I.A.2, *supra*; Compl. ¶ 87.

4    Further, if Plaintiff is forced to adopt the policy mandated by the Certification Demand Letter, the

5    Complaint alleges that the result will be "to significantly increase harms to California's

6    transgender (and intersex) residents, diminish the benefits of inclusive school environments to all

7    students, and increase corresponding healthcare and other costs borne by California." Compl. ¶

8    106. Such hardships weigh heavily in favor of this Court exercising its jurisdiction here.

9    **III.   PLAINTIFF'S APA CLAIMS ARE REVIEWABLE**

10          The Defendants assert that Plaintiff's APA claims should be dismissed because the

11   Certification Demand Letter is not a reviewable "final agency action" and that any "future

12   enforcement action against a school district is committed to the DOJ's sole discretion." *See* Mot.

13   at 18-19.  Both arguments must be rejected. While Defendants attempt to recast the Certification

14   Demand Letter as "advisory," that assertion is contrary to the letter's actual text and the context

15   precipitating it, as explained in Part I.B, *supra*. *Compare* Mot. at 20 ("the letter was merely a part

16   of a fact-finding effort to determine which school districts are complying with the bylaw and

17   which are not") *with* Compl., Exh. A ("To . . . avoid legal liability . . . you must certify . . . that

18   you will not implement CIF Bylaw 300.D"). Instead, the letter marks the consummation of

19   Defendants' decisionmaking process and imposes legal obligations on the LEAs.  And

20   Defendants cannot meet the high bar of establishing that certification demand letters are the type

21   of agency actions that are "committed to agency discretion by law." *See* 5 U.S.C. § 701(a)(2)).

22          **A.    The Certification Demand Letter Is a Final Agency Action**

23          The Certification Demand Letter, threatening legal action if California LEAs fail to certify

24   that they will not implement Bylaw 300.D, is not merely an "advisory letter" as Defendants claim

25   in their motion, but instead constitutes final agency action reviewable under the Administrative

26   Procedure Act ("APA"). *See* 5 U.S.C. § 704. An agency action, which "cover[s] comprehensively

27   every manner in which an agency may exercise its power," *Whitman v. Am. Trucking Ass'ns*, 531

28   U.S. 457, 478 (2001), is "final" if it (1) "marks the consummation of the agency's

15

1  decisionmaking process" and (2) determines "rights or obligations" or imposes "legal

2  consequences," *Bennett v. Spear*, 520 U.S. 154, 177–78 (1997) (cleaned up). Courts interpret

3  finality in a "pragmatic and flexible manner." *Oregon Nat. Desert Ass'n v. U.S. Forest Serv.*, 465

4  F.3d 977, 982 (9th Cir. 2006) (internal quotation marks omitted); *see also Gill v. U.S. Dep't of*

5  *Justice*, 913 F.3d 1179, 1184 (9th Cir. 2019) ("Regardless of an agency's characterization, we

6  consider the actual effects of the action to determine whether it is final.").

7      As to the first *Bennett* prong, Defendants do not dispute that the Certification Demand

8  Letter marks the "consummation" of the federal government's "decisionmaking process." Indeed,

9  the letter unequivocally declares that CIF Bylaw 300.D is unconstitutional and directs LEAs to

10  immediately comply. There is nothing "merely tentative or interlocutory" about the letter's

11  conclusion, *Bennett*, 520 U.S. at 178, and Defendants do not suggest they will reconsider. Where

12  Defendants "state a definite position in formal notices," that is a sign that "its decisionmaking

13  processes are clearly consummated." *San Francisco Herring Ass'n v. Dep't of the Interior*, 946

14  F.3d 564, 579 (9th Cir. 2019).

15      Likewise, the Certification Demand Letter is an agency action "by which rights or

16  obligations have been determined, *or* from which legal consequences will flow." *Bennett*, 520

17  U.S. at 177–78 (emphasis added). Only one is necessary to state a claim, and the allegations in the

18  Complaint are sufficient to show both. First, the Certification Demand Letter does not simply

19  restate a longstanding view—it announces Defendants' new position that California's decade-

20  long policy of transgender inclusion in school sports violates the Equal Protection Clause,

21  necessarily "alter[ing] the legal regime to which [California] is subject." *Oregon Nat. Desert*

22  *Ass'n*, 465 F.3d at 987. Further, the Certification Demand Letter directs immediate compliance,

23  stating that LEAs "must certify … that you will not implement CIF Bylaw 300.D." Compl., Exh.

24  A; *see Sackett v. EPA*, 566 U.S. 120, 126 (2012) (holding an EPA letter to be final agency action

25  because it not only stated a violation, but ordered petitioners to restore the property and give the

26  agency access). This "determination" of LEA's "obligations" directly affects Plaintiff, which has

27  an interest in enforcing its own law and a responsibility to prevent discrimination in its public

28  education system. *See* Part I.A, *supra*; *Ukiah Valley Med. Ctr. v. FTC*, 911 F.2d 261, 264 (9th

16

1    Cir. 1990) (final agency action is found where such action "impose[s] an obligation, den[ies] a

2    right, or fix[es] some legal relationship"). This case is distinguishable from *Advanced Med. Sci.*

3    *Inst., PLLC v. Garland*, 24 F.4th 1249 (9th Cir. 2022), and *City of San Diego v. Whitman*, 242

4    F.3d 1097 (9th Cir. 2001), where the agencies responded to a request for guidance but did not

5    require the parties to do anything.[5]

6          Second, as explained in Part I.B, *supra*, the Complaint sufficiently alleges that "legal

7    consequences . . . flow" from the Certification Demand Letter because renouncing Bylaw 300.D

8    and certifying to Defendants is the only way "[t]o . . . avoid legal liability." Compl., Exh. A.

9    Defendants cite *Rhea Lana, Inc. v. Dep't of Lab.*, 824 F.3d 1023, 1025 (D.C. Cir. 2016), where

10   the court rejected the argument that a letter determined rights and obligations because (unlike

11   here) the letter simply restated the agency's "longstanding view" of the law and had no

12   "mandatory and immediate requirements." *Id.* at 1028. But Defendants omit the crucial part of

13   that decision and misstate the holding. The court in *Rhea Lana* nevertheless held that the letter

14   *was* a final agency action because legal consequences flowed: the agency could seek additional

15   penalties if the party did not comply after receiving the letter. *Id.* at 1030. The court took the

16   "Department at its word" as to these threatened consequences, even if the agency "might not

17   succeed in establishing the underlying violation." *Id.* at 1032; *see also Sackett*, 566 U.S. at 126

18   ("legal consequences flow[ed]" where letter allowed agency to seek additional penalties if the

19   party did not comply). The Certification Demand Letter, as in *Sackett* and *Rhea Lana*, threatens

20   liability if LEAs do not certify, while also promising that they can "avoid" liability if they do.

21   Thus, the Complaint sufficiently alleges that "legal consequences will flow" from the letter

22   itself—and not just from Defendants' unsupported interpretation of the Equal Protection Clause.

23   *See also U.S. Army Corps of Eng'rs v. Hawkes Co.*, 578 U.S. 590, 599-600 (2016) (finding final

24   agency action where letter functioned to deny a "safe harbor" and put the party at the "risk of

25   _____

      [5] The out-of-circuit cases that Defendants rely on are similarly distinguishable. They are either at
26   odds with Ninth Circuit authority, *compare Solar Turbines Inc. v. Seif*, 879 F.2d 1073, 1081 (3rd
      Cir. 1989) *with Alaska Dep't of Env't Conserv. v. EPA*, 244 F.3d 748 (9th Cir. 2001), *aff'd*, 540
27   U.S. 461, 483 (2004) (holding that "rights or obligations" of parties were determined by EPA
      order to halt construction), dealt with agency actions that were in the middle of administrative
28   proceedings, or expressed the agency's view of the law without requiring any action from the
      recipients of its letters. *See* Mot. at 19-22.

                                                      17

significant criminal and civil penalties" if they proceeded); *CSI Aviation Servs., Inc. v. U.S. Dep't of Transp.*, 637 F.3d 408, 410, 412-13 (D.C. Cir. 2011) (finding final agency action where agency letter said ceasing alleged violation would shield party from future enforcement action).

**B.     The Certification Demand Letter Is Not an Action Committed to Agency Discretion**

Defendants' argument that Plaintiffs' APA claim is precluded by 5 U.S.C. § 701(a), because "any future enforcement action" is "committed to DOJ's discretion," also misses the mark, because Plaintiff is not challenging Defendants' non-enforcement. Mot. at 22. The APA "embodies 'a basic presumption of judicial review'" and while review is not available under section 701(a)(2) when agency action is "committed to agency discretion by law," courts read this exception "quite narrowly." *Dep't of Commerce*, 588 U.S. at 771-772. Such exceptions can include "an agency's decision not to prosecute or enforce." *Heckler v. Chaney*, 470 U.S. 821, 831 (1985); *cf. id.* at 832 ("Similarly, when an agency *does* act to enforce, that action itself provides a focus for judicial review, inasmuch as the agency must have exercised its power in some manner") (emphasis in original).

Plaintiffs' APA claim, however, does not challenge Defendants' decision not to enforce—or to enforce, for that matter—but instead it challenges the Certification Demand Letter, which, as the Complaint alleges: (1) sets forth a new interpretation of the Equal Protection Clause that is contrary to law and unconstitutional, (2) creates a certification requirement not authorized by any statute, and (3) conditions funding on compliance without clear notice. Compl. ¶¶ 162-164. In those respects, the Certification Demand Letter violates the APA, irrespective of Defendants' future actions. As such, Section 701(a)(2) simply does not apply. *See, e.g.*, *Montana Air Chapter No. 29, Ass'n of Civ. Technicians, Inc. v. Fed. Lab. Rels. Auth.*, 898 F.2d 753, 758 (9th Cir. 1990) ("Statutory interpretations promulgated in the course of an agency's nonenforcement decision are reviewable in their own right"); *Artichoke Joe's v. Norton*, 216 F.Supp. 2d 1084, 1115 (E.D. Cal. Aug. 5, 2002), *aff'd*, 353 F.3d 712 (9th Cir. 2003) (holding that neither *Heckler* not Section 701(a)(2) bar review where plaintiffs "seek review of agency action, as opposed to a discretionary decision to forego enforcement of a statute"); *Nat'l Wildlife Fed'n v. U.S. E.P.A.*, 980 F.2d 765,

18

1    773 (D.C. Cir. 1992) (finding "presumption of unreviewability of agency nonenforcement

2    decisions" inapplicable where plaintiffs challenged agency's "statutory interpretation" and did not

3    "contest a particular enforcement decision") (citations omitted); *Edison Electric Inst. v. EPA*, 996

4    F.2d 326, 333 (D.C. Cir. 1993) (same).

5    **IV.  PLAINTIFF'S ULTRA VIRES CLAIMS ARE JUSTICIABLE**

6    Defendants contend that *Nuclear Regulatory Comm'n v. Texas*, 145 S. Ct. 1762 (2025)

7    ("*NRC*") forecloses relief on Plaintiff's *ultra vires* claims. Mot. at 23-24. It does not. *NRC* merely

8    affirmed the high bar established in *Leedom v. Kyne*, 358 U.S. 184 (1958) for *ultra vires* claims

9    where a statute—in *NRC*, the Hobbs Act—expressly precludes judicial review. *See NRC*, 605

10   U.S. at 681-83. In this case, there is no statute that precludes judicial review, and so the *Leedom*

11   exception to such limitations on judicial review is not relevant. In the absence of a limitation on

12   judicial review, it is well established that "actions by subordinate Executive Branch officials that

13   extend beyond delegated statutory authority—i.e., *ultra vires* actions—are reviewable." *Murphy*

14   *Co. v. Biden*, 65 F.4th 1122, 1129 (9th Cir. 2023), cert. denied, 144 S. Ct. 1111 (2024) (citing

15   *Larson v. Domestic & Foreign Com. Corp.*, 337 U.S. 682, 689–90 (1949)).

16   *Murphy* provides the relevant standard. There, the Ninth Circuit rejected the argument that

17   the plaintiff lacked a "cause of action" to challenge the Department of the Interior, the Secretary,

18   and the President himself over a monument designation as having violated of statute. *Id.* at 1125,

19   1129. The Court stated that the justiciability of *ultra vires* claims against the Secretary was "a

20   simpler question" than those against the President. *Id.* at 1129. Even there, the Court recognized

21   that "[i]n addition to Murphy's arguments under *Larson*, Murphy's challenge implicates

22   separation of powers concerns" and held that "whether characterized as *ultra vires* or

23   constitutional, the result is the same: we resolve that Murphy's claims against the President . . .

24   are justiciable." *Id.* at 1129-30.

25   While *Murphy* involved an allegation that the President violated the provisions of a statute,

26   the justiciability of an *ultra vires* claim is even more clear when, as here, it is alleged that the

27   challenged action "lacked both 'statutory authority' and 'background constitutional authority.'"

28   *Murphy*, 65 F.4th at 1130 (citation omitted); *see* Compl. ¶¶ 131-32. "[A]n agency literally has no

19

1    power to act, let alone pre-empt the validly enacted legislation of a sovereign State, unless and

2    until Congress confers power upon it." *La. Pub. Serv. Comm'n v. FCC*, 476 U.S. 355, 357 (1986).

3    Plaintiffs allege here that Defendants lacked statutory authority and constitutional authority to

4    issue the Certification Demand Letter, a similar allegation to the one made in *Youngstown Sheet*

5    *& Tube Co. v. Sawyer*, 343 U.S. 579, 587 (1952). In that case, "[t]he [Supreme] Court never

6    questioned that it had the authority to provide the requested relief." *Sierra Club v. Trump*, 963

7    F.3d 874, 891 (9th Cir. 2020), *vacated and remanded on other grounds, sub nom. Biden v. Sierra*

8    *Club*, 142 S. Ct. 46 (2021). That Plaintiff's claims are brought against "subordinate Executive

9    Branch officials" rather than the President makes this a "simple[]" application of *Larson*. *Murphy*,

10   65 F.4th at 1129.

11         Although "Congress may . . . limit a court's equitable power to enjoin acts violating federal

12   law," Defendants have not identified any statute *authorizing* their conduct, much less a statute

13   precluding judicial review. *Sierra Club*, 929 F.3d at 697; *see also id.* at 694 (APA does not

14   preclude equitable review). Therefore, Defendants' reliance on *Leedom v. Kyne*, 358 U.S. 184

15   (1958) is misplaced. The "*Leedom v. Kyne* exception" allows, "in certain limited circumstances,

16   judicial review of agency action for alleged statutory violations *even when a statute precludes*

17   *review*." *Nyunt v. Chairman, Broadcasting Bd. of Govs.*, 589 F.3d 445, 449 (D.C. Cir. 2009)

18   (emphasis added). Thus, although *NRC* referred loosely to *Leedom* challenges as a type of *ultra*

19   *vires* claim, that case—and every precedent cited by it—involved the applicability of a particular

20   statutory limitation on judicial review. *Id.* at 1775, 1779 n.4 (challenge to licensing decision

21   outside of "exclusive judicial-review provision" of Hobbs Act); *Leedom*, 368 U.S. at 187

22   (challenge to labor certification order despite "exclusive" review provision of National Labor

23   Relations Act); *Boire v. Greyhound Corp.*, 376 U.S. 473, 476-77 (1964) (same); *Ry. Clerks v.*

24   *Ass'n for Benefit of Non-contract Empl.*, 380 U.S. 650, 660 (1965) (same as to Railway Labor

25   Act); *Board of Governors, FRS v. MCorp Fin., Inc*., 502 U.S. 32, 43 (1991) (attempt to enjoin

26   pending enforcement proceedings in spite of limitation on judicial review in Financial Institutions

27   Supervisory Act); *Nyunt*, 589 F.3d at 449 (attempt to assert employment discrimination claims in

28   spite of "exclusive" review under Civil Service Reform Act). *NRC* made no mention of, and did

1   not overrule, *Larson*, *Youngstown*, or the numerous other cases involving equitable review of

2   executive action where there was no such statute precluding judicial review. In the absence of

3   preclusion of review, there is no need to resort to the *Leedom* "exception" to such preclusion, and

4   *Murphy* governs this case.

5          Defendants also attempt to shoehorn Plaintiff's Spending Clause claim into this same

6   inapplicable framework. In Count III, however, Plaintiff contends that the Certification Demand

7   Letter places an unconstitutional condition on federal funding, not simply that such an action is

8   *ultra vires*. It is well established that a party can seek equitable relief against the federal

9   government for a Spending Clause violation. *See, e.g., Yellen*, 34 F.4th at 847, 852-53; *see also,*

10  *Free Enterprise Fund v. Pub. Co. Accounting Bd.*, 561 U.S. 477, 491 n.2 (2010) (rejecting

11  argument that there is no "implied private right of action directly under the Constitution to

12  challenge governmental action").

## CONCLUSION

14         Based on the foregoing, Defendants' motion to dismiss should be denied.

15  Dated:  September 26, 2025                    Respectfully submitted,

16                                               ROB BONTA
                                                 Attorney General of California
17                                               MICHAEL NEWMAN
                                                 Senior Assistant Attorney General
18                                               JOEL MARRERO
                                                 Supervising Deputy Attorney General
19
                                                 /s/ Ezra Kautz
20                                               EZRA KAUTZ
                                                 Deputy Attorney General
21                                               *Attorneys for Plaintiff State of California*

22

23

24

25

26

27

28